Filed 9/10/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G048615, G048616 |
| v. | (Super. Ct. Nos. 06SF0747, 09CF0222) |
| SCOTT ANDREW CHRISTENSEN, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Gary S. Paer, Judge. Affirmed.

Law Offices of Ronald A. Ziff, Ronald A. Ziff and Abby Besser Klein for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Andrew Mestman, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Scott Andrew Christensen was convicted of multiple counts of lewd acts upon a child under the age of 14 (Pen. Code, § 288, subd. (a)).  In his first trial, he was convicted with respect to his acts against one victim, Spencer S., but the jury deadlocked with respect to his acts against another victim, Joshua K.  Defendant argues the court made various errors in the retrial on the counts pertaining to Joshua.  He says the court erred in admitting both the testimony Joshua gave in the first trial (Evid. Code, § 240, subd. (a)(3)) and the evidence of the prior offense against Spencer (Evid. Code, §§ 352, 1108).  He also contends that his convictions should be reversed due to prosecutorial misconduct and that his sentence of 27 years to life is excessive.[1]  We disagree as to each point and affirm.

I

FACTS

*A.  BACKGROUND:*

Defendant was a leader at an afterschool daycare program at an elementary school.  The daycare program operated out of portable classrooms on the school campus.  Sometimes, the leaders would show movies and they often would sit on the floor with the children.

In 2002 or 2003, when Zachary S. was in the second or third grade, defendant sat down next to him during a movie.  Defendant allegedly grabbed Zachary's hand, put it down his own pants underneath his underwear, and placed it on his erect penis.  Defendant asked Zachary if he "lik[ed] it."  Zachary got up, washed his hands, and sat somewhere else.  He did not tell his parents about the matter at the time.

---

[1]     In his opening brief, defendant also asserts that the abstract of judgment did not correctly reflect the sentence imposed by the court.  In his appellant's reply brief, however, he abandons this claim.

Joshua also attended the daycare program while he was in kindergarten in 2005 and 2006. During a movie, defendant sat next to him and put his hand on his butt, underneath his underwear. He also tried to touch Joshua's penis. Joshua also did not report the matter to his parents at the time.

A third child who attended the daycare program was Spencer. When Spencer was six years old, in 2006, defendant came to his house to babysit. While they were sitting on the couch, defendant put Spencer's penis in his mouth and sucked on it. Defendant also put his penis in Spencer's mouth. Spencer told his mother the next day.

Spencer's mother called the police. She also called defendant, who then admitted the conduct to her. Spencer had an interview with a social worker on August 7, 2006. He reiterated the conduct during the interview.

Two days later, Joshua's parents received a letter from the school district stating that a daycare program counselor had been arrested. Joshua's father then asked him if any inappropriate touching had occurred. Joshua initially said, "no," but later said that someone had put his hand down his pants and touched his butt and his "front." When asked to identify the person, Joshua named defendant. Joshua's parents reported the matter to the authorities.

Sometime in 2006, while living out of state, Zachary's mother heard that defendant had been arrested. She asked Zachary whether defendant had done anything to him, and Zachary said, "no." About two years later, however, when Zachary was 14, he disclosed the incident with defendant to his sister. She told their parents. Zachary then acknowledged the incident, and his parents reported the matter to the police.

B. *PROCEDURAL HISTORY:*

Defendant was charged by amended information in *People v. Scott Andrew Christensen* (Super. Ct. Orange County, 2013, No. 06SF0747) (First Lawsuit) with four counts of lewd acts upon a child under the age of 14 (Pen. Code, § 288, subd. (a)).

3

Counts 1 and 2, for oral copulation of defendant and oral copulation of victim, respectively, had to do with Spencer. Counts 3 and 4, for first time touching and last time touching, respectively, pertained to Joshua. It was further alleged, as to counts 1 and 2, that defendant had had substantial sexual conduct with Spencer. (Pen. Code, § 1203.066, subd. (a)(8)). It was also alleged, as to all counts, that defendant had committed an offense specified in Penal Code section 667.61 against more than one victim.

Spencer and Joshua each testified at the first trial, in March 2008. Joshua was about seven years old at the time. During the first trial, defendant conceded as to the Spencer counts, 1 and 2, but not as to the Joshua counts, 3 and 4.

In April 2008, the jury found defendant guilty of counts 1 and 2, pertaining to Spencer. It also found true the allegation that defendant had engaged in substantial sexual conduct with Spencer. The jury deadlocked 10 to two in favor of guilt on counts 3 and 4, pertaining to Joshua, and the court declared a mistrial as to those counts. Sentencing on counts 1 and 2 was deferred until after the retrial on counts 3 and 4.

Less than a year later, defendant was charged in *People v. Scott Andrew Christensen* (Super. Ct. Orange County, 2013, No. 09CF0222) (Second Lawsuit) with one count of lewd act upon a child under the age of 14 (Pen. Code, § 288, subd. (a)), pertaining to Zachary. Thereafter, the First Lawsuit and the Second Lawsuit were consolidated.

In February 2012, a second amended information was filed in the consolidated cases, charging defendant with three counts of lewd acts upon a child under the age of 14 (Pen. Code, § 288, subd. (a)). Count 1 pertained to Zachary. Counts 2 and 3 pertained to Joshua. It was further alleged, with respect to each count, that defendant had had substantial sexual conduct with a child under age 14, namely masturbation (Pen. Code, § 1203.066, subd. (a)(8)). It was also alleged, with respect to each count in both the First Lawsuit and the Second Lawsuit, that defendant had committed an offense specified in Penal Code section 667.61 against more than one victim.

4

In their February 23, 2012 trial brief, the People requested that Joshua be found unavailable as a witness, pursuant to Evidence Code sections 1291 and 240. The People represented that Joshua had suffered mentally and emotionally since the time he testified in the first trial, that he had undergone years of therapy, and that he was only then recovering emotionally. They further stated Joshua had been diagnosed with Asperger's syndrome, and his father feared that if Joshua were required to testify again, he would suffer substantial emotional, mental and physical trauma. The People requested that Joshua's prior testimony be admitted in lieu of current testimony in the retrial.

The court held an evidentiary hearing on the matter. The People provided the testimony of Dr. Andrew Schneider, Joshua's treating physician, Beverly Ann Russ, a licensed marriage and family therapist who had treated Joshua in the past, and Joshua's father. Each of them opined that it would be detrimental to Joshua for him to testify. The court granted the People's motion and permitted them to use Joshua's prior trial testimony under Evidence Code section 1291.

The jury found defendant guilty on each of the three counts. It also found the allegations under Penal Code sections 1203.066, subdivision (a)(8) and 667.61, subdivisions (b) and (e) true with respect to each count. Defendant was sentenced to a total of 27 years to life, on the convictions pertaining to acts against Spencer, Zachary, and Joshua. Defendant appeals.

II

DISCUSSION

A. *UNAVAILABILTY OF WITNESS:*

*(1) Introduction—*

"'The United States Supreme Court has established that a defendant's Sixth Amendment right to confrontation is a fundamental right, applicable to the states through the Fourteenth Amendment. [Citation.] The California Constitution now provides a specific guarantee of the right to confrontation: "The defendant in a criminal cause has

5

the right . . . to be confronted with the witnesses against the defendant." (Cal. Const., art. I, § 15.) A similar guarantee is codified in section 686, subdivision 3, of the Penal Code, which provides that in a criminal action the defendant is entitled "to produce witnesses on his behalf and to be confronted with the witnesses against him, in the presence of the court . . . ."' [Citation.] [¶] A traditional exception to this confrontation requirement exists where a witness is unavailable and has given testimony at a prior judicial proceeding against the same defendant at which time the witness was subject to cross-examination by that defendant. [Citation.]" (*People v. Winslow* (2004) 123 Cal.App.4th 464, 469.)

The statutory underpinnings of this exception are found in Evidence Code section 1291, subdivision (a)(2), which provides: "Evidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and: [¶] . . . [¶] (2) The party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing."

A declarant is "unavailable as a witness" if he or she is "[d]ead or unable to attend or to testify at the hearing because of then-existing physical or mental illness or infirmity." (Evid. Code, § 240, subd. (a)(3).) "Expert testimony that establishes that physical or *mental trauma resulting from an alleged crime has caused harm to a witness of sufficient severity that the witness* is physically unable to testify or *is unable to testify without suffering substantial trauma* may constitute a sufficient showing of unavailability pursuant to paragraph (3) of subdivision (a). As used in this section, the term 'expert' means a physician and surgeon, including a psychiatrist, or any person described by subdivision (b), (c), or (e) of Section 1010." (Evid. Code, § 240, subd. (c), italics added.) A licensed marriage and family therapist is a person described in Evidence Code section 1010, subdivision (e).

"The burden of proving that a hearsay declarant is unavailable as a witness is upon the prosecution. [Citation.]" (*People v. Williams* (1979) 93 Cal.App.3d 40, 51, disapproved on another point in *Coito v. Superior Court* (2012) 54 Cal.4th 480.) The prosecution must prove unavailability by a preponderance of the evidence. (*People v. Williams*, *supra*, 93 Cal.App.3d at p. 51.)

"[T]he determination whether a witness is unavailable to testify at trial due to mental illness or infirmity that would cause substantial trauma, is a mixed question of law and fact, with factual findings subject to a deferential standard of substantial evidence, and findings of law subject to independent review. [Citation.] Where the trial court's decision of a mixed question of fact and law implicates the constitutional right to confront a witness at trial, we apply de novo review. [Citation]." (*People v. Mays* (2009) 174 Cal.App.4th 156, 172; see also, *People v. Winslow*, *supra*, 123 Cal.App.4th at pp. 470-471.)

*(2) Defendant's Arguments—*

Defendant contends the court erred in admitting, in the second trial, the testimony Joshua gave in the first trial. Defendant claims that, because of this error, the finding on the multiple victim enhancement must be reversed.

According to defendant, Joshua was alive and not "unavailable" within the meaning of Evidence Code section 240, subdivision (a)(3), and could have been required to testify. Defendant emphasizes that the statutory exceptions to the hearsay rule are narrowly construed (see, e.g., *People v. Cogswell* (2010) 48 Cal.4th 467 [Evid. Code, § 240, subd. (a)(5)]), and he says they do not apply here.

As defendant points out, the court in *People v. Gomez* (1972) 26 Cal.App.3d 225 construed Evidence Code section 240, subdivision (a)(3) as meaning "that the illness or infirmity must be of comparative severity; it must exist to such a degree as to render the witness's attendance, or his testifying, relatively impossible and not merely inconvenient." (*Id.* at p. 230.) Defendant states that in the context before us,

7

it was not impossible for Joshua to testify; it would have been merely inconvenient for him to have suffered the short-lived stress of testifying, so Joshua was not "unavailable" within the meaning of section 240, subdivision (a)(3).

Later cases, however, have refined the concept of relative impossibility as expressed in *People v. Gomez*, *supra*, 26 Cal.App.3d 225.  As stated in *People v. Winslow*, *supra*, 123 Cal.App.4th 464:  "In the context of mental illness or infirmity, the phrase 'relatively impossible' to testify does not mean it is impossible to elicit the testimony due to insanity or coma or other total inability to communicate.  Rather, the phrase includes the relative impossibility of eliciting testimony *without risk of inflicting substantial trauma on the witness*."  (*Id.* at pp. 471-472, italics added; accord, *People v. Mays*, *supra*, 174 Cal.App.4th at p. 172.)

*(3)  Evidence—*

Psychiatrist Dr. Andrew Schneider was Joshua's treating physician.  He had been treating Joshua for mental illness for approximately 20 months at the time of trial.  Dr. Schneider diagnosed Joshua with Asperger's syndrome, a form of higher-functioning autism.  He also stated Joshua's intelligence level was "below average" and he struggled "with comprehending things to a point where it [could] really affect him emotionally."

Dr. Schneider stated that Joshua's then current level of functioning was "not very good" and he opined that if Joshua had to testify, it would cause him significant emotional trauma.  He explained that even with medication and regular treatment, Joshua was "struggling" and "having an extremely hard time controlling his emotional reactions."  He opined that a lot of Joshua's behavior was driven by past trauma.  Dr. Schneider believed that sexual trauma was key—specifically the sexual trauma at issue in the case.  He expressed his belief that bringing up the alleged sexual abuse again "would make things much worse."

Dr. Schneider further stated he himself was "actually very concerned about Joshua and how [he was] doing." He had already discussed with Joshua's parents the possibility of removing Joshua from his home, to provide him with 24-hour live-in treatment. Dr. Schneider said that was "about as bad as it [got.]" He described Joshua as being "about the worst" emotionally compared to other patients in his practice. Dr. Schneider opined that if Joshua were required to testify again, the effects would be "substantial and long-lasting."

The court also received testimony from Beverly Ann Russ, a licensed marriage and family therapist. Russ had been a therapist for more than 30 years and specialized in trauma cases. She treated Joshua from about August 2006, shortly after the incident occurred, to January 7, 2009. At that point, Russ felt that they had stabilized the trauma and it was time to switch Joshua to someone specializing in cognitive behavioral therapy, because he had ongoing issues. Russ said, for example, during one of the last sessions she had with Joshua, he displayed an "extensive angry outburst," in which he took a box of crayons, broke them in half and threw them at her. Then, he took his arms and "[swiped] through the play house, crashing the equipment—took about an hour to clean up."

Russ was asked whether there was a change in Joshua's behavior in April 2008, after Joshua had testified in the first trial. She stated there was "just a complete regression in his behavior." On April 16, for example, he would not leave the side of his mother, who had to accompany him into the therapy room, where he curled up in her lap and remained in a fetal position for the entire 45-minute session. At an April 30 session, Joshua spoke very little, and his mother reported that he would not sleep alone and that he was developing phobias with spiders and flies. Joshua had become very thin and would not eat, and his parents had made an appointment with a psychiatrist, Dr. Mark Kozins. Russ stated, with respect to the April 30 session, that Joshua definitely remained "regressed."

Russ opined that if Joshua had to testify again, it would "reduce him to a much lower level of functioning" and would cause "severe regression." She did not believe the effects would be short-lived. In addition, Russ anticipated that Joshua would suffer both academic and social problems at school. She said that it took from April 2008, after the first trial, until January 2009 to get Joshua sufficiently well stabilized just to be able to switch to a behavioral specialist. His problems had not been resolved at that point, just stabilized.

In addition to Russ and Dr. Schneider, Joshua's father, David, testified. David said that when then seven-year-old Joshua finished testifying in the first trial, he grabbed a hold of his father, started crying, and would not let go. Afterwards, Joshua was scared, slept on his parents' bedroom floor "in fear," and "had bouts of anger." Joshua's fears for his safety, nightmares and bouts of anger were "pretty constant for a year," David said. David further stated that testifying was very traumatic for Joshua and he believed it would be "very traumatic," "devastating," for him to have to testify again.

David said that Joshua's anxiety level, at the time of the second trial, was very high and that they had to constantly shuffle his medication to get his anxiety under control. He expressed his opinion that the trauma would not be short-lived, that it might take him a long time to recover.

Furthermore, David said Joshua continues to ask when defendant will get out of jail. David said his own main fear was in having Joshua see defendant again.

Although Joshua stopped seeing Russ at some point after the first trial, he then saw psychiatrist Dr. Kozins. Joshua saw Dr. Kozins until he started seeing Dr. Schneider. David made clear that Joshua was at all times seeing someone, whether a therapist, psychologist or psychiatrist, from 2006 until the time of the retrial.

David acknowledged that he had commenced a civil suit with respect to Joshua's molestation. However, David testified that he dropped the civil suit "[w]hen he

10

had a deposition." He told his attorney that he would not have his son testify again given the traumatic effect on him.

*(4) Analysis—*

Having heard the foregoing testimony, the judge stated he "would have to put ear plugs in and blinders on to" conclude Joshua would not be traumatized by testifying again. Defendant, however, contends the evidence was insufficient to demonstrate that Joshua was "unavailable" within the meaning of Evidence Code section 240, subdivision (a)(3).

Defendant says that Joshua's diagnosis is merely Asperger's syndrome, which he describes as "a high-functioning and relatively mild form of autism that at most affects social interactions . . . ." It is not, he contends, "a 'mental illness' that rendered [Joshua] 'unable to attend or to testify at the hearing,' within the meaning of Section 240, subdivision (a)(3)." We can only describe this as a callous and myopic characterization of the evidence.

True, Dr. Schneider testified that Joshua suffers from Asperger's syndrome, and he described the syndrome as a form of "higher-functioning autism." He further stated that persons with Asperger's syndrome "have extreme deficits in social interactions and behaviors or areas of interest that are extremely restrictive and repetitive." However, Dr. Schneider also testified that he treated Joshua for "mental illness."

In any event, the "Asperger's" label is not the most important thing here. Dr. Schneider testified that Joshua's emotional condition was "about the worst" of any patient in his practice. Moreover, he opined that Joshua's problems were rooted in past sexual trauma and that if Joshua were required to testify again, the effects would be "substantial and long-lasting."

Defendant nonetheless attempts to minimize the testimony. He points out that Dr. Schneider conceded it would be traumatic for any child to testify about sexual

11

abuse in front of a bunch of adults. Yes, but Joshua was not the average child. He was already precariously poised. Joshua's condition was so severe that his treating physician had already discussed with his parents the possibility of removing him from the family home and placing him in a facility for 24-hour treatment. Dr. Schneider expressed his belief that bringing up the alleged sexual abuse again "would make things much worse."

Moreover, Russ opined that if Joshua had to testify again, it would "reduce him to a much lower level of functioning" and he would demonstrate "severe regression." She did not believe it would have only short-term effects. Rather, she believed it would "have some extreme effects later on."

Defendant also says the evidence showed "that any emotional trauma suffered by Joshua following both the alleged molestation and his testimony at the first trial was transitory . . . ." He says, inter alia, that Joshua's treatments were terminated "despite the knowledge that he would have to testify at the first trial;" and that Joshua's emotional state after the first trial "had been 'stabilized,' to the point that Joshua was apparently expecting to testify, despite his misgivings, at a civil trial against the school district."

A closer examination of the evidence, however, shows that although treatments with Russ were terminated in January 2009, Joshua's treatments continued thereafter with Dr. Kozins, and subsequently with Dr. Schneider. Indeed, Joshua's father testified that Joshua had been provided with continuous treatment by one professional or another. Furthermore, while it is fair to point out that Joshua's parents apparently had considered having Joshua testify at a civil trial, the point of the matter is that, according to Joshua's father, they ultimately decided Joshua was not in any condition to testify and they resolved to settle the litigation rather than put Joshua through the ordeal a second time.

12

In short, in the matter before us, we have the testimony of two expert witnesses—one psychiatrist and one marriage and family therapist—to the effect that Joshua would be severely traumatized, and suffer a substantial and long-lasting regression in his condition, were he required to testify again. Consequently, this case is similar to *People v. Winslow*, *supra*, 123 Cal.App.4th 464 [13-year-old sodomy victim] and *People v. Gomez*, *supra*, 26 Cal.App.3d 225 [statutory rape], in which the appellate courts affirmed determinations that the victims were "unavailable," within the meaning of Evidence Code section 240, subdivision (a)(3), based on medical testimony. It is distinguishable from *People v. Williams*, *supra*, 93 Cal.App.3d 40, wherein the appellate court overturned a finding that a rape victim was unavailable to testify, because of the lack of medical testimony on the point.

Substantial evidence, in the form of expert testimony, supports the trial court's finding of fact that Joshua would suffer substantial trauma if he had to testify again. Furthermore, having performed an independent review, we conclude the trial court properly applied the law to the facts to determine that Joshua was "unavailable," within the meaning of Evidence Code section 240, subdivision (a)(3), inasmuch as it would have been relatively impossible for Joshua to testify without suffering substantial trauma.

## B. EVIDENCE OF PRIOR OFFENSE:

### (1) Introduction—

"In 1995, the Legislature enacted [Evidence Code] section 1108 to expand the admissibility of disposition or propensity evidence in sex offense cases. Subdivision (a) of that section provides in pertinent part that 'In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by [Evidence Code] Section 1101, if the evidence is not inadmissible pursuant to [Evidence Code] section 352

13

[permitting court to exclude evidence on weighing probative value and prejudicial impact].'" (*People v. Falsetta* (1999) 21 Cal.4th 903, 911.)  "Available legislative history indicates section 1108 was intended in sex offense cases to relax the evidentiary restraints section 1101, subdivision (a), imposed, to assure that the trier of fact would be made aware of the defendant's other sex offenses in evaluating the victim's and the defendant's credibility.  In this regard, section 1108 implicitly abrogates prior decisions of this court indicating that 'propensity' evidence is per se unduly prejudicial to the defense.  [Citation.]" (*People v. Falsetta*, *supra*, 21 Cal.4th at p. 911.)

The *Falsetta* court continued:  ". . . , 'Our elected Legislature has determined that the policy considerations favoring the exclusion of evidence of uncharged sexual offenses are outweighed in criminal sexual offense cases by the policy considerations favoring the admission of such evidence.  The Legislature has determined the need for this evidence is "critical" given the serious and secretive nature of sex crimes and the often resulting credibility contest at trial.  [Citations.]'  [Citations.]" (*People v. Falsetta*, *supra*, 21 Cal.4th at pp. 911-912.)

"By reason of [Evidence Code] section 1108, trial courts may no longer deem 'propensity' evidence unduly prejudicial per se, but must engage in a careful weighing process under [Evidence Code] section 352.  Rather than admit or exclude every sex offense a defendant commits, trial judges must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense.  [Citations.]" (*People v. Falsetta*, *supra*, 21 Cal.4th at pp. 916-917.)

14

*(2) Procedural Background—*

The People made an Evidence Code section 402 motion[2] to admit, pursuant to Evidence Code section 1360,[3] the social worker's interview of Spencer when he was six years old. They also expressed an intention to call Spencer to testify. They stated his testimony was relevant with respect to the multiple victim allegation. The court granted the motion.

On a subsequent occasion, the court asked the People about the theory behind bringing Spencer back to testify. The People responded that the evidence would be used as Evidence Code section 1108 evidence and also to prove the multiple victim allegation. The court expressed concern about letting the jury know that defendant had already been convicted with respect to a different victim. The court also said: "Counts 1 and 2 dealt, in my mind, with more severe conduct than an unlawful touching. You had oral copulation. In the court's mind, oral copulation is far more involved than a hand in the wrong place."

In addition, the court expressed concern about the peculiar procedural posture with two separate cases having been filed and the multiple victim allegation of the First Lawsuit remaining unresolved. He suggested the possibility of bifurcation. The court said defendant would not be prejudiced because the jury would not hear about either oral copulation or convictions. Defense counsel expressed agreement with the suggestion, as long as the jury would not "somehow find out about the conviction." The

---

2     Evidence Code section 402, subdivision (b) provides: "The court may hear and determine the question of the admissibility of evidence out of the presence or hearing of the jury; but in a criminal action, the court shall hear and determine the question of the admissibility of a confession or admission of the defendant out of the presence and hearing of the jury if any party so requests."

3     Evidence Code section 1360 makes admissible "a statement made by the victim when under the age of 12 describing any act of child abuse . . . performed with or on the child by another . . ." under specified circumstances.

15

court replied: "Oh, no. That's instant mistrial." The People agreed that only the conduct, not the conviction, would be put before the jury.

Two days later, the court addressed the motion to introduce Evidence Code section 1108 evidence in the form of testimony from Spencer and his mother. It asked defense counsel whether he desired to make any comments. Defense counsel made a perfunctory objection. The People argued that it was propensity evidence that was clearly admissible under section 1108. The court ruled that the section 1108 evidence would be admitted.

*(3) Arguments—*

Defendant argues that the trial court, in the retrial of the Joshua counts, erred on numerous grounds in admitting evidence of prior acts against Spencer. We disagree, for reasons we shall show.

*(a) Probative value*

Defendant argues the evidence of the uncharged offenses was irrelevant, and thus lacking in probative value, because it was completely dissimilar to the evidence of the charged offenses. We cannot agree there. In the cases of Joshua and Zachary, the conduct involved defendant brazenly molesting elementary school age boys he was supervising while in a room in which other children and adults were present—in one case putting his hand down the pants of the boy and in the other case putting the hand of the boy down his own pants. In the case of Spencer, the acts involved defendant and a young boy he was babysitting in the privacy of a home, in which defendant orally copulated the boy and made the boy orally copulate him. The incidents are all similar in that they are sex acts against young boys entrusted to his care, some acts involving the touching of the boy and other acts involving the touching of defendant. Evidence showing that defendant went even further with a young boy in private than he did with other boys in public is not lacking in probative value. To the contrary, "evidence of a 'prior sexual offense is indisputably relevant in a prosecution for another sexual offense.' [Citation.] Indeed, the

16

reason for excluding evidence of prior sexual offenses in such cases is not because that evidence lacks probative value; rather it is because "'it has too much." [Citation.]' [Citation.]" (*People v. Branch* (2001) 91 Cal.App.4th 274, 282-283; accord, *People v. Falsetta*, *supra*, 21 Cal.4th at p. 915.)

### (b)  Prejudicial nature

That ties into defendant's next point.  He says that the Spencer evidence, which the trial court itself observed was more serious, was inflammatory.  Indeed, he says the People used the evidence to "incite" the jury.  He cites a portion of the reporter's transcript in which the prosecutor stated during closing argument:  "Am I trying to incite you?  Absolutely I am.  I'm trying to incite you based on the facts.  Am I trying to incite you?  Absolutely I am.  I don't want you to be fooled."

However, defendant is loose in his description of the context in which these remarks were made.  The prosecutor observed that defendant contended Zachary and Joshua were liars who made up stories as suggested to them.  In particular, the prosecutor addressed the issue of how Joshua was questioned and whether it was suggested to him that he was molested by defendant.  The prosecutor described the evidence concerning Joshua's disclosure of defendant's acts, and noted the fact that it was Joshua who identified defendant as the man who had molested him.  The prosecutor emphasized that defendant's identity had never been suggested and that it was only after Joshua had identified him that defendant's identity was otherwise made known through program leaders and news reports.  After reminding the jury of this evidence, the prosecutor asked the jurors to "put two and two together" and not to leave their "common sense at the door."  Then the prosecutor said he was trying to incite the jury "based on the facts," whereas he characterized the defense arguments as pure fiction.  The prosecutor did not, as defendant indicates, endeavor to "incite" the jury based on the Spencer evidence.

Irrespective of whether the prosecutor used the Spencer evidence to incite the jury, however, defendant maintains that the Spencer evidence should have been

17

excluded as inflammatory. The inflammatory nature of the uncharged conduct is indeed a factor to be considered. (*People v. Branch*, *supra*, 91 Cal.App.4th at pp. 282-283.) Although the Spencer evidence is more severe, it is not so much so that it should be excluded without a consideration of other factors or a balancing of factors. (*Id.* at pp. 282-284.) "[I]t is unlikely that the jury would have been so prejudiced against [defendant] as a consequence of [the] 'inflammatory' testimony that he was denied a fair trial." (*Id.* at pp. 283-284.)

Defendant disagrees. He says the use of the inflammatory evidence bolstered the extremely weak case with respect to Joshua. Defendant points out that Joshua was inconsistent in his statements regarding the number of times the touching purportedly occurred. Furthermore, Joshua at one point stated that several other boys at school had told him defendant had touched them inappropriately. However, the parties stipulated that this information was not true. And, he emphasizes that there was a hung jury on the Joshua counts in the first trial.

While this is so, we observe that the jury deadlocked 10 to two in favor of conviction in the first trial, so it was not a close case. More importantly, the fact that a child was unclear as to the number of touchings is not surprising under any circumstance. Finally, the fact that Joshua identified defendant as the perpetrator before defendant's identity was disclosed by other means is arguably of greater probative value than the fact that Joshua erroneously relayed that other boys had said they were touched, too.

*(c) Confusing the issues and misleading the jury*

Next, defendant argues that both the trial court and defense counsel were mistaken in failing to disclose to the jury that he had been convicted of the uncharged offenses with respect to Spencer. He says the failure to make this disclosure may have increased the chance that the jury punished him for the uncharged offenses. Indeed, it has been observed that "[i]f the prior offense did not result in a conviction, that fact

18

increases the danger that the jury may wish to punish the defendant for the uncharged offenses[.]" (*People v. Branch*, *supra*, 91 Cal.App.4th at p. 284.)

However, as the People point out, the jury was instructed with CALCRIM No. 1191, regarding the use of the evidence of uncharged offenses against Spencer. The jury was instructed that it was permitted to use that evidence as propensity evidence with respect to the charged offenses and that the evidence alone did not constitute sufficient proof that defendant was guilty of a lewd act on a child under age 14. Furthermore, the possibility of confusing the issues is only one factor involved in the trial court's balancing process, as further addressed below.

*(d) Failure to weigh factors*

Defendant claims there is no evidence to show that the trial court performed the required balancing of factors. We disagree.

In ruling that the Evidence Code section 1108 evidence would be admitted, the court stated: "1108[, subdivision] (a) states that in an action where the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense is not made inadmissible by 1101 if the evidence is not inadmissible pursuant to 352. *The court did conduct a 352 analysis* in the court's mind, and . . . that information from the prior case would be *highly probative* as to the issues before the court in this case. And . . . that information *is not outweighed by any prejudice*. [¶] In the instant case, we have *two alleged victims dealing with sexual offenses*. The court case dealt with one victim with a sexual offense. There is no time limit under 1108. Certainly it's *not remote* in time. But it's the court's position that it would be admissible under 1108." (Italics added.)

As the above-referenced quote shows, the court indicated on the record an awareness that it was required to perform an Evidence Code section 352 analysis including a weighing of factors and that it had performed that analysis. It further indicated that the evidence showed a similarity in the various offenses, inasmuch as each

19

alleged offense was a sexual offense, and that the evidence of the uncharged offenses had probative value. It also mentioned that the uncharged offenses were not remote in time. The court also indicated that it had considered whether the probative value was outweighed by prejudice, and had concluded this was not the case, even though it did not articulate its reasoning on the record.

As observed in *People v. Branch*, *supra*, 91 Cal.App.4th 274, a court has not abrogated its duty to undertake an analysis under Evidence Code section 352 where the record shows that the court addressed certain of the factors relevant to a section 352 determination, indicated that it understood it was required to make a section 352 balancing determination, and described the balance required between the probative value of the evidence and the prejudicial effect of its admission. (*People v. Branch*, *supra*, 91 Cal.App.4th at p. 282; see also *People v. Lewis* (2009) 46 Cal.4th 1255, 1285.)

"We review a challenge to a trial court's choice to admit or exclude evidence under [Evidence Code] section 352 for abuse of discretion. [Citation.] We will reverse only if the court's ruling was 'arbitrary, whimsical, or capricious as a matter of law. [Citation.]' [Citation.]" (*People v. Branch*, *supra*, 91 Cal.App.4th at p. 282.) Given this, we cannot say the court erred in admitting the evidence.[4]

## C. PROSECUTORIAL MISCONDUCT:

In his closing argument, defense counsel addressed the issue whether the daycare program had deliberately hired a child molester. He said it would make no sense for the daycare program to have done so. He continued: "Did they hire a person who turned out to be a child molester? Yes, [defendant] was a child molester. He's a child molester. He did a child molest on Spencer S., okay?" However, defense counsel

---

[4]    This being the case, we need not address defendant's argument that the purported error in admitting the Spencer evidence constituted a due process violation.

20

emphasized that, this notwithstanding, there was no evidence that defendant was a serial pedophile who had gotten away with it for years.

Defense counsel further stated: "You don't have an idea that you have to send a message to the child molest community . . . about how we don't like child molesters. You don't have to do that. Obviously, nobody likes child molesters. [Defendant] is a child molester. . . . But . . . that does not make him guilty of every child molest that ever happened." He further stated that when defendant "got called by [Spencer's mother] in the covert call . . . , [he] did not contest it. He admitted it right from the start." Defense counsel continued on by stating defendant was not some "slick guy who was getting away with child molesting all these years. The first time [he was] ever accused of child molesting, . . . he admit[ted] it. So he's not some slick guy."

Defense counsel made similar comments later on, including: "He did a bad thing. He molested Spencer. He's a child molester. That does not mean he's guilty of all the child molests ever that happened at this school. Doesn't mean he gets to be accused of doing all these terrible things for years and years. He did a bad thing. He acknowledged it when the mother called him up."

Finally, defense counsel said: "It's a terrible thing that [defendant] did to Spencer. [Defendant] has to live with that. It would be a terrible thing to make him live with something that he didn't do."

The prosecutor responded to these comments in its rebuttal closing argument. The prosecutor urged the jury not to give defendant "extra points" for copping out to the fact that he had sucked Spencer's penis. After all, he had been caught on tape making the admission. In this context, the prosecutor stated: "Are we going to try him if he molested all the other kids at the school? That's not for you to consider. It's improper for you to consider. There could be 15 victims out there; there could be 2. There's only 2 before you. Don't worry about the other stuff. That's improper."

21

Defendant says these comments constituted prosecutorial misconduct. However, defense counsel made no objection at trial to the statements he now challenges on appeal. The People assert that any claim of prosecutorial misconduct is therefore waived.[5] We agree.

"'As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.]' [Citation.] [¶] The foregoing, however, is only the general rule. A defendant will be excused from the necessity of either a timely objection and/or a request for admonition if either would be futile. [Citations.] In addition, failure to request the jury be admonished does not forfeit the issue for appeal if '"an admonition would not have cured the harm caused by the misconduct."' [Citations.]" (*People v. Hill* (1998) 17 Cal.4th 800, 820-821.)

Defendant argues that the issue of prosecutorial misconduct is not waived, because any objection would have been futile. He claims that requesting the court to instruct the jury to disregard the statements would be the same as requesting the court to unring the bell. We disagree. To ask the jury not to speculate on whether there might have been other victims would have been a simple enough instruction—one the jury ought to have been able to follow easily. In any event, even if the issue were not waived, we would hold the statements were not tantamount to prosecutorial misconduct.

"'The applicable federal and state standards regarding prosecutorial misconduct are well established. "'A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process."'" [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally

---

[5] The failure of defense counsel to object is the subject of a companion petition for a writ of habeas corpus.

unfair is prosecutorial misconduct under state law only if it involves "'"the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury."'" [Citation.]' [Citations.]" (*People v. Hill*, *supra*, 17 Cal.4th at p. 819.)

"Prosecutors, however, are held to an elevated standard of conduct. . . . A prosecutor is held to a standard higher than that imposed on other attorneys because of the unique function he or she performs in representing the interests, and in exercising the sovereign power, of the state. [Citation.] As the United States Supreme Court has explained, the prosecutor represents "a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." [Citation.]'" (*People v. Hill*, *supra*, 17 Cal.4th at pp. 819-820.)

As defendant points out, it is improper for the prosecutor to misstate either the facts or the law. (*People v. Hill*, *supra*, 17 Cal.4th at pp. 830-831.) It may also be misconduct to make reference to matters outside the record. (*People v. Ledesma* (1987) 43 Cal.3d 171, 238.) But here, we have a situation where defense counsel called defendant a "child molester" and said that did not mean he was a "slick guy who was getting away with child molesting all these years," or that he was "guilty of all the child molests ever that happened at this school."

The prosecutor simply responded to defense counsel's comments by advising the jury that it was improper to consider whether defendant had molested children other than those at issue in the case. There was no impropriety in doing so. "[W]hen we consider each of the challenged comments in its context, we simply cannot conclude that the prosecutor used a method to persuade the jury that was 'deceptive' or reprehensible.'" (*People v. Berryman* (1993) 6 Cal.4th 1048, 1072, overruled on another ground in *People v. Hill*, *supra*, 17 Cal.4th at p. 823, fn. 1.) If anything, his comments were ameliorative.

23

*D. CRUEL AND UNUSUAL PUNISHMENT:*

*(1) Introduction—*

Defendant was convicted of a total of five counts of lewd acts upon a child under the age of 14 (Pen. Code, § 288, subd. (a))—two counts with respect to Joshua, two counts with respect to Spencer, and one count with respect to Zachary. For the principal term, the court sentenced defendant to 15 years to life on the first Joshua count, applying the Penal Code section 667.61, subdivisions (b) and (e) multiple victim enhancement. It also sentenced defendant to eight years on the second Joshua count, under Penal Code section 288, subdivision (a), to run consecutively to the principal term. In addition, the court sentenced defendant to two years on each of the Spencer counts, also to run consecutively. (Pen. Code, § 1170.) Finally, it sentenced defendant to 15 years to life on the Zachary count, to run concurrently with the principal term. The total sentence was 27 years to life. The People point out that defendant was 30 at the time of sentencing and received a sentence that, together with custody credits, will make him eligible for parole when he is about 53.

Defendant asserts that, even if this court were to affirm his convictions, it would still be required to reduce his sentence because 27 years to life constitutes cruel and/or unusual punishment under the United States and California Constitutions. He does not argue that the sentencing scheme is unconstitutional per se, but rather that it is unconstitutional as applied in his case. He emphasizes that the length of the sentence is grossly disproportionate to the nature of the offenses he committed, especially taking into the fact that he has no prior criminal record and the offenses did not involve force or violence.

At the outset, the People, citing *People v. Norman* (2003) 109 Cal.App.4th 221, state that defendant's argument is waived for failure to raise it in the trial court. Defendant says that is not so, because any failure to raise the point in the trial court

would give rise to an ineffective assistance of counsel claim. Waiver aside, we choose to address the issue on appeal.

*(2) United States Constitution—*

The Eighth Amendment to the United States Constitution declares: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The clause has been applied to prohibit both "the imposition of inherently barbaric punishments" and punishments that are "disproportionate to the crime." (*Graham v. Florida* (2010) 560 U.S. 48, 59.)

Defendant cites *Solem v. Helm* (1983) 463 U.S. 277, wherein the Supreme Court stated "a court's proportionality analysis under the Eighth Amendment should be guided by objective criteria, including (i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions." (*Id.* at p. 292.) He relies on this statement of law without mention or discussion of subsequent Supreme Court decisions, such as *Harmelin v. Michigan* (1991) 501 U.S. 957, *Ewing v. California* (2003) 538 U.S. 11, *Lockyer v. Andrade* (2003) 538 U.S. 63, and *Graham v. Florida*, *supra*, 560 U.S. 48.

In *Harmelin v. Michigan, supra,* 501 U.S. 957, Justice Scalia, joined by Chief Justice Rehnquist, stated: "We conclude . . . that *Solem* was simply wrong; the Eighth Amendment contains no proportionality guarantee." (*Id.* at p. 965.) However, in his concurring opinion, Justice Kennedy, joined by Justice O'Connor and Justice Souter, stated, "*stare decisis* counsels our adherence to the *narrow* proportionality principle that has existed in our Eighth Amendment jurisprudence for 80 years." (*Id.* at p. 996, first italics original, second italics added.)

Thereafter, "in *Ewing v. California*[, *supra*,] 538 U.S. 11, a majority of the United States Supreme Court concluded that in noncapital cases, the Eighth Amendment either contains only a narrow proportionality principle . . . or that it contains no

25

proportionality principle at all . . . . [Citation.] Under the narrow proportionality principle recognized by the plurality, the Eighth Amendment does not require strict proportionality between the offense and the resulting sentence and does not mandate comparative analysis within or between jurisdictions. [Citation.] Rather, it forbids only extreme sentences that are grossly disproportionate to the crime. [Citation.] In weighing the gravity of the defendant's offenses, a court must consider both his criminal history and his current felony. [Citation.] The *Ewing* plurality noted that, outside the capital context, successful challenges to the proportionality of a particular sentence are exceedingly rare. [Citation.]" (*People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 844.)

More recently, the Supreme Court acknowledged that its precedents had "not been a model of clarity. [Citation.]" (*Lockyer v. Andrade*, *supra*, 538 U.S. at p. 72.) However, it stated that the "thicket of Eighth Amendment jurisprudence" notwithstanding, it had been clearly established that "[a] gross disproportionality principle is applicable to sentences for terms of years." (*Ibid.*) Even more recently, it said: "Embodied in the Constitution's ban on cruel and unusual punishments is the 'precept of justice that punishment for crime should be graduated and proportioned to [the] offense.' [Citation.]" (*Graham v. Florida*, *supra*, 560 U.S. at p. 59.)

In considering a proportionality challenge to the length of a term-of-years sentence, "the Court considers all of the circumstances of the case to determine whether the sentence is unconstitutionally excessive." (*Graham v. Florida*, *supra*, 560 U.S. at p. 59.) The *Graham* court stated with approval: "The controlling opinion in *Harmelin* explained its approach for determining whether a sentence for a term of years is grossly disproportionate for a particular defendant's crime. A court must begin by comparing the gravity of the offense and the severity of the sentence. [Citation.] '[I]n the rare case in which [this] threshold comparison . . . leads to an inference of gross disproportionality' the court should then compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same

crime in other jurisdictions. [Citation.] If this comparative analysis 'validate[s] an initial judgment that [the] sentence is grossly disproportionate,' the sentence is cruel and unusual. [Citation.]" (*Id.* at p. 60.)

So, in answer to the challenge of defendant in the matter before us, we start by comparing the gravity of his offense and the severity of the sentence imposed. Viewed along a spectrum, we may find murder, mayhem and torture among the most grave of offenses and petty theft among the least. Considered in this context, lewd conduct on a child may not be the most grave of all offenses, but its seriousness is considerable. It may have lifelong consequences to the well-being of the child. We need look no further than one of the victims here, Joshua, to see the devastating impact. Defendant's conduct with respect to Joshua resulted in a mental and emotional state so severe that the boy was on the verge of being removed from the family home and placed in a 24-hour care facility.

Furthermore, defendant's offenses were multifold. He was convicted not of one offense, but of five. He molested not one boy, but three. Any one act in isolation was a serious offense. Cumulatively, without a doubt, his offenses were grave. As stated in *Graham v. Florida*, *supra*, 560 U.S. 48, "'punishment for crime should be graduated and proportioned to [the] offense.' [Citation.]" (*Id.* at p. 59.) Moreover, as observed in *Ewing v. California*, *supra*, 538 U.S. 11, in determining proportionality, the state's choice to deal with repeat offenders in a harsher manner is a penological goal that must be taken into account. (*Id.* at p. 29.) Taking these factors into consideration, we cannot conclude that the penalty is harsh in relation to the gravity of the offenses. "The gross disproportionality principle reserves a constitutional violation for only the extraordinary case." (*Lockyer v. Andrade*, *supra*, 538 U.S. at p. 77.) This is not that case.

*(3) California Constitution—*

Article I, section 17, of the California Constitution also proscribes cruel or unusual punishment. A prison sentence violates article I, section 17, if "it is so

27

disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424, fn. omitted.) "*Lynch* suggests three areas of focus: (1) the nature of the offense and the offender; (2) a comparison with the punishment imposed for more serious crimes in the same jurisdiction; and (3) a comparison with the punishment imposed for the same offense in different jurisdictions. [Citation.] Disproportionality need not be established in all three areas." (*People v. Norman*, *supra*, 109 Cal.App.4th at p. 230.)

We start with the first area of focus, with respect to which defendant cites *People v. Dillon* (1983) 34 Cal.3d 441 (disapproved on another ground in *People v. Chun* (2009) 45 Cal.4th 1172, 1185-1186). In examining the nature of the offense, "the courts are to consider not only the offense in the abstract —i.e., as defined by the Legislature— but also 'the facts of the crime in question' [citation]—i.e., the totality of the circumstances surrounding the commission of the offense in the case at bar, including such factors as its motive, the way it was committed, the extent of the defendant's involvement, and the consequences of his acts. [¶] . . . [T]he courts must also view 'the nature of the offender' in the concrete rather than the abstract: although the Legislature can define the offense in general terms, each offender is necessarily an individual. . . . This branch of the inquiry therefore focuses on the particular person before the court, and asks whether the punishment is grossly disproportionate to the defendant's individual culpability as shown by such factors as his age, prior criminality, personal characteristics, and state of mind." (*People v. Dillon*, *supra*, 34 Cal.3d at p. 479.)

Here, we see that defendant molested several small boys over a period of several years. The parents of those children had entrusted them to his care and supervision. He repeatedly breached the trust placed in him. Under the guise of providing small children with care, he molested them. Defendant acted alone, not cajoled by others. He brazenly molested children even in a public place, and engaged in more serious acts when the opportunity for privacy arose. The impact on at least one of those

28

children was so severe, as we have stated, that he suffered a mental and emotional condition that could result in his removal from the family home for treatment.

Defendant emphasizes that he had no prior criminal record, before being convicted for offenses against three different children. However, the timing of the discovery of the acts, and of the prosecutions and convictions, is pure happenstance. The crimes were committed over a period of years. In any event, the lack of a prior criminal record is not determinative. (*People v. Martinez* (1999) 76 Cal.App.4th 489, 497.) In short, in considering the nature of the offenses and the offender, we conclude the punishment imposed upon defendant, one who commits repeated molestations against small children, is not disproportionate to his culpability.

Turning to the second area of focus, defendant argues the length of his sentence exceeds that imposed for more violent and serious crimes in California. He cites a number of California statutes, only one of which pertains to sexual offenses. That statute is Penal Code section 264, subdivision (a), imposing a sentence of three, six or eight years for rape. Defendant omits to mention that Penal Code section 264, subdivision (c)(1) imposes a sentence of 9, 11, or 13 years for rape of a child under the age of 14. So, as we can see, the punishment imposed under Penal Code section 288, subdivision (a), a sentence of three, six, or eight years for a conviction for lewd acts upon a child under the age of 14, is less severe than the sentence for rape of a child. Defendant also omits to discuss the fact that his sentence of 27 years to life was imposed not for one lewd act upon a single victim, but for multiple lewd acts against multiple victims. He also does not address any parallel sentencing for multiple acts of rape. "The penalties for single offenses . . . cannot properly be compared to those for multiple offenses . . . ." (*People v. Crooks* (1997) 55 Cal.App.4th 797, 807.)

Of the other statutes defendant cites, the one bearing the most severe punishment is Penal Code section 190, which he characterizes as imposing a punishment of 25 years to life for first degree murder. As he duly points out, first degree murder is a

more serious crime than lewd conduct upon a child under the age of 14, yet he received a more severe punishment than 25 years to life. Defendant provides an incomplete description of the range of punishment available under Penal Code section 190, however. That statute provides the punishment for first degree murder shall be "death, imprisonment in the state prison for life without the possibility of parole, or imprisonment in the state prison for a term of 25 years to life." In other words, the punishment for first degree murder, a crime of greater severity than lewd conduct upon a child, can indeed be far more severe than a sentence of 25 years to life. And once again, defendant declines to address the fact that he was sentenced to 27 years to life not for a solitary count against a single victim. Rather, his sentence was imposed because he was convicted of crimes against three separate victims, and of multiple offenses against some of them. Consequently, the statute he cites is not comparable. (*People v. Crooks*, *supra*, 55 Cal.App.4th at p. 807.)

In the third area of focus, we examine "a comparison of the challenged penalty with the punishments prescribed for the *same offense* in *other jurisdictions* having an identical or similar constitutional provision." (*In re Lynch*, *supra*, 8 Cal.3d at p. 427, italics in original.) "Here the assumption is that the vast majority of those jurisdictions will have prescribed punishments for this offense that are within the constitutional limit of severity; and if the challenged penalty is found to exceed the punishments decreed for the offense in a significant number of those jurisdictions, the disparity is a further measure of its excessiveness." (*Ibid.*)

Defendant cites the statutes of six other states pertaining to lewd conduct with children, albeit without discussion of the constitutional provisions of those states. He observes the punishment under those statutes ranges from four to eight years on the low end, to five years to life on the high end. He emphasizes that those sentences are far more lenient than the 15 years to life sentence set forth in Penal Code section 667.61, subdivision (b). However, defendant acknowledges in a footnote that none of those sister

30

state statutes embodies a multiple victim enhancement. That difference is key. (See *People v. Crooks*, *supra*, 55 Cal.App.4th at p. 807.) Were we comparing similar statutes, we would compare the sister state statutes to Penal Code section 288, subdivision (a), establishing a punishment of three, six, or eight years. Defendant's citations simply do not show that the punishment inflicted pursuant to Penal Code section 667.61, subdivision (b) is excessive in comparison with punishments imposed for the same offense in different jurisdictions. (*In re Lynch*, *supra*, 8 Cal.3d at p. 427; *People v. Norman*, *supra*, 109 Cal.App.4th at pp. 231-232.)

## III

## DISPOSITION

The judgment is affirmed.


MOORE, ACTING P. J.

WE CONCUR:


IKOLA, J.


THOMPSON, J.

31