Filed 6/16/15  P. v. Oliveras CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  The opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G049942 |
| v. | (Super. Ct. No. 12NF2171) |
| GALDINO ADOLFO OLIVERAS, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Lance Jensen, Judge.  Affirmed with directions.

Sharon M. Jones, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson, Lynne G. McGinnis and Kristine A. Gutierrez, Deputy Attorneys General, for Plaintiff and Respondent.

\*        \*        \*

A jury convicted defendant Galdino Adolfo Oliveras (born in November 1973) of aggravated sexual assault on a child under age 14 and at least 10 years younger (former Pen. Code, § 269, subd. (a)(4) [version in effect until Sept. 19, 2006]; all statutory citations are to the Penal Code), three counts of lewd acts on a child under age 14 (§ 288, subd. (a)), and forcible oral copulation (§ 288a, subd. (c)(2)). Oliveras contends his prison sentence of 35 years to life is cruel and unusual punishment. For the reasons expressed below, we affirm with directions.

I

FACTUAL AND PROCEDURAL BACKGROUND

Guadalupe L. (born in 1992) testified she lived with her grandparents in Mexico until the age of 10, when she moved to Orange County with her mother, stepfather (defendant Olivares), and a younger half brother. Their apartment had two bedrooms. Guadalupe's family slept in one bedroom, while other renters occupied the adjacent bedroom.

Olivares first touched Guadalupe sexually when she was approximately 12 years old. Her mother and brother were away for the day. Olivares chased her around the house, where he ultimately grabbed and kissed her. He touched and massaged her breasts and buttocks over her clothing. The incident lasted about 20 to 30 minutes until her mother came home, and Olivares ran into the bathroom.

On subsequent occasions Olivares would "every now and then pass" Guadalupe and discretely touch her buttocks over her pants. He would sometimes hold her against the wall inside the bedroom, lift her shirt up, touch and massage her breasts under her bra, and kiss her. She would try to fight him off. He warned her not to tell anyone, and that no one would believe her.

Around the time Guadalupe turned 13 years old, Olivares on numerous occasions sucked her breasts, often leaving marks or "hickeys." During this period he

2

also began touching her vagina over her pants and rubbing back and forth. This occurred more than once. Just before Guadalupe turned 14, he began putting his hand under her underpants and massaging her vagina.

When Guadalupe was in the eighth grade (age 13), Olivares on several occasions removed her pants and licked her vagina. She tried to push or kick him away, but he had his elbows on her legs and held her hands so she could not move. He sometimes grabbed Guadalupe's hand and pulled her into the bedroom, locking the door. These sexual incidents occurred two or three times a week when she was 12 and 13 years old.

When Guadalupe was in the ninth grade, Olivares began rubbing his penis against her vagina skin-to-skin. He did not penetrate her but he would ejaculate on her bed. She would have to clean the sheets with paper towels, toilet paper, or napkins, and flush them down the toilet. This happened repeatedly throughout her high school years. Guadalupe resisted Olivares's advances, but sometimes she did not physically resist because she knew she could not get away.

Beginning when Guadalupe was in the 10th or 11th grades, Olivares forced her to perform oral sex on him. He left her notes telling her to meet him in the bedroom and threatened to hit her if she did not lock the door.

Olivares also made Guadalupe watch pornographic videos with him. He would tell her to watch scenes and "do that on him." He also took photos of her breasts and vagina, gave her lingerie, and directed her to pose for the pictures.

The sexual incidents continued until Guadalupe moved out of the house after she turned 18 years old. She did not tell her mother because she felt her mother would not believe her, feared Olivares would strike her mother because he had assaulted her in the past. She moved to Mexico and in May 2012 told an aunt and cousin Olivares had sexually abused her for years. Guadalupe's mother contacted the Anaheim Police Department when other family members told her mother about the abuse.

3

A police officer arranged for Guadalupe to telephone Olivares while the officer listened in. A recording of the call was played for the jury. During the call, Olivares claimed he never forced or threatened Guadalupe and he believed she was "okay with it." Olivares defended his conduct, explaining he believed it was not abuse because she "agreed to it" and she had "led [him] on." He noted he "didn't even rape" her and further explained she was "like [his] lady" and "belonged to [him]," and "for [him] everything was good [and] it was beautiful." Olivares claimed he had not wanted to hurt her, and he had wanted her to have his child. He denied "disgracing" her by taking her virginity, and claimed he did not know she acted out of fear. But he agreed she always told him to leave her alone and that she wanted to leave.

Guadalupe's mother testified she found a note in June 2012 written by Olivares that caused her to suspect he was doing something improper with Guadalupe. The note read: "Take that bra off because the stitching on the corner makes it look like you have big areolas and the people might want them and those are mine." She went to the police about a month later. Guadalupe had not previously complained that Olivares had abused her.

Officers arrested Olivares after the covert call with Guadalupe. They found digital video recordings containing pornography, digital memory cards with nude photos of Guadalupe, and with Guadalupe wearing lingerie. Officers interviewed Olivares at the police station and a recording of the interview was played for the jury. He admitted sexual activity short of sexual intercourse, but denied Guadalupe performed oral sex on him. He declared he never forced her and she was "always okay with it," but acknowledged he did not think about her age or the consequences of his actions.

Following a trial in December 2013, the jury convicted Olivares as noted above. In February 2014, the court imposed an indeterminate prison term of 15 years to life for aggravated sexual abuse (former § 269, subd. (a)(4) [version in effect until Sept. 19, 2006]; count 1), a consecutive eight-year determinate term for committing lewd acts

4

as charged as count 2 (§ 288, subd. (a)), consecutive two-year terms (one-third midterm) for committing the lewd acts as charged in counts 3 and 4, and a consecutive eight-year term for the forcible oral copulation violation charged in count 5 (§ 288a, subd. (c)(2)).

## II

### DISCUSSION

A.    *Olivares's Sentence Is Not Unconstitutionally Cruel or Unusual*

Olivares contends imposition of a sentence of 35 years to life imprisonment constitutes cruel and unusual punishment under the United States and California Constitutions because he had no prior criminal record, and his current convictions did not involve penetration or the infliction of physical injury.

Punishment that is grossly disproportionate to the offender's culpability violates constitutional norms prohibiting "cruel and unusual" (U.S. Const., 8th Amend.) and "cruel or unusual" (Cal. Const., art. I, § 17) punishment.  (*Harmelin v. Michigan* (1991) 501 U.S. 957, 997 (*Harmelin*) (conc. opn. of Kennedy, J.) [Eighth Amendment "encompasses a narrow proportionality principle"]; *People v. Dillon* (1983) 34 Cal.3d 441, 478 (*Dillon*).)  Because "in our tripartite system of government it is the function of the legislative branch to define crimes and prescribe punishments" (*In re Lynch* (1972) 8 Cal.3d 410, 414), a defendant bears a "considerable burden" to show the requisite disproportionality.  (*People v. Wingo* (1975) 14 Cal.3d 169, 174.)  Consequently, such findings "have occurred with exquisite rarity in the case law."  (*People v. Weddle* (1991) 1 Cal.App.4th 1190, 1196.)

Olivares's sentence did not violate the Eighth Amendment's narrow proportionality principle forbidding extreme sentences that are grossly disproportionate to the crime.  (See *Harmelin*, *supra*, 501 U.S. at pp. 997, 1000-1001 (conc. opn. of Kennedy, J.) [upholding life without parole sentence for possessing a large quantity of cocaine]; *Hutto v. Davis* (1982) 454 U.S. 370 [upholding sentence of 40 years for

5

possession of marijuana with intent to distribute and distribution of marijuana].) Nor, considering the nature of the offense and the offender, was this punishment so disproportionate to the offenses that it "shock[s] the conscience and offend[s] fundamental notions of human dignity" under the California Constitution. (*In re DeBeque* (1989) 212 Cal.App.3d 241, 249; *Dillon*, *supra*, 34 Cal.3d at p. 479 [court examines the "'nature of the offense and/or the offender, with particular regard to the degree of danger both present to society'" and asking whether the punishment is grossly disproportionate to the defendant's individual culpability as shown by such factors as his age, prior criminality, personal characteristics, and state of mind].)

The record reflects the jury found Olivares committed numerous sexual offenses against Guadulupe spanning a period of six years, including forcible acts of oral copulation. In committing these offenses Olivares violated the trust of a child who looked to him for support. We could not put it more poignantly than Guadulupe did in her statement contained in the probation report: "[T]his situation caused me to lose people, including my own mother. I lost my self-esteem to the point where I did not value my life and didn't consider myself worthy of being alive." Guadalupe declared the emotional damage she suffered "can never be amended [sic]." (See Blow, *Surviving Child Sexual Abuse*, N.Y. Times (June 1, 2015) p. A19 [noting "[c]hild sexual abuse is tragic and traumatic for its survivors," "it breaks bonds of trust," violates "the sovereignty of the self and one's zone of physical intimacy," "[i]t is an action of developmental exploitation," and "a spiritual act of violence that attacks not only the body but also the mind" and "can take decades, or even a lifetime, to recover if recovery is even emotionally available for the survivor"].)

As the court noted, the "victim . . . was particularly vulnerable. This is a matter that encompassed multiple molestations of the victim during a period of time when she was 12 and 13 years old. And they were separate, divisible occasions and showed a history of conduct that increased in severity over time. [¶] There certainly was

6

a level of planning and sophistication shown. You lived in the premises where the offenses took place. You made sure that your then girlfriend was not present. And you took advantage of probably one of the most cherished relationships a child can have with a parent, and that is a position of trust. Not only trust of the victim, but trust of your then girlfriend who entrusted you to take care of her child." The court noted it had weighed aggravating and mitigating circumstances, noting Olivares did not have a prior criminal record, but that the aggravating factors "far outweigh[ed] any mitigating circumstances."

Olivares, in his 30's when the offenses began, disregarded Guadalupe's welfare to satisfy his own desires and rationalized his actions in the delusional belief Guadalupe reciprocated his affections. Given the repetitive nature of the sexual abuse over a long period of time, we do not find it particularly significant Olivares had no other criminal history, a score of zero on the Static-99R actuarial measure of recidivism, and that family members, friends, and coworkers supported a lenient sentence because he was devoted to his family and worked hard. The sentence in this case does not exceed those upheld in similar cases. (See *People v. Christensen* (2014) 229 Cal.App.4th 781, 807-808 [defendant sentenced to term of 27 years to life for five counts of lewd acts on a child under the age of 14 against two victims; court noted lewd conduct is a grave offense and may have lifelong consequences to the well-being of the child]; *People v. Meneses* (2011) 193 Cal.App.4th 1087, 1092 [15-years-to-life sentence for man convicted of single lewd act with his 12-year-old cousin resulting in pregnancy not cruel or unusual]; *People v. Crooks* (1997) 55 Cal.App.4th 797, 807 [penalties for single offenses cannot properly be compared to those for multiple offenses]; *People v. Bestelmeyer* (1985) 166 Cal.App.3d 520, 531-532 [sentence of 129 years for multiple acts of sexual abuse against 11-year-old stepdaughter not cruel or unusual].)

B.    *The Trial Court Did Not Order Oliveras to Pay Interest on the Restitution Fine, but the Trial Court Must Correct Its Minutes to Reflect Interest on Any Victim Restitution Will Be Calculated from the Date of the Loss*

The trial court imposed a restitution fine of $7,000.  It reserved jurisdiction to award direct victim restitution (§ 1202.4, subd. (f) [court must order the defendant to make restitution to the victims where the victim has suffered economic loss as a result of the defendant's conduct]), noting the probation report was unclear whether Olivares had made restitution.  The court ordered Olivares to pay interest "on the restitution at the rate of 10 percent, and that will be from the date of loss.  [¶] All restitution will be payable through the Department of Corrections."

Olivares argued in his opening brief the court lacked authority to impose interest on restitution.  In his reply brief, he agreed with the Attorney General interest on direct victim restitution is authorized.  (§ 1202.4, subd. (f)(3)(G) [restitution order must fully reimburse the victim for every determined economic loss including "[i]nterest, at the rate of 10 percent per annum, that accrues as of the date of sentencing or loss, as determined by the court."].)  But he suggests it is unclear whether the court ordered interest to be paid on the restitution fine, which is not authorized.  We disagree.  The court's order referenced interest from "the date of loss."  That clearly would not refer to the fine, which was not triggered by a "loss."  We agree with the Attorney General the trial court must correct its minute order and the abstract of judgment, which incorrectly recorded that interest was to be paid was calculated from the date of the sentencing hearing, rather than the date of loss as the trial court had ordered.  (*People v. Mitchell* (2001) 26 Cal.4th 181, 185-187.)

## III

### DISPOSITION

The judgment is affirmed.  The trial court is directed to correct its minutes dated February 7, 2014 to reflect interest for victim restitution is to be paid as of the date

8

of loss.  The trial court is directed to prepare an amended abstract of judgment and to forward a certified copy to the Department of Corrections and Rehabilitation.


                                                    ARONSON, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


IKOLA, J.