Filed 4/26/21  P. v. Rivera CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G057350 |
| v. | (Super. Ct. No. 14NF4686) |
| ANTHONY MICHAEL RIVERA, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Jonathan S. Fish, Judge.  Affirmed.

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Eric A. Swenson, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

Defendant Anthony Michael Rivera sexually abused his step-granddaughter, Jane Doe No. 1, for years. When she was 10 years old, she realized he was also molesting her five-year-old sister, Jane Doe No. 2, and reported the abuse. A jury subsequently convicted defendant of: one count of sexual intercourse with Jane Doe No. 1 (Pen. Code, § 288.7, subd. (a); count 1);[1] three counts of oral copulation with Jane Doe No. 1 (§ 288.7, subd. (b); counts 2, 3 & 4) and one count with Jane Doe No. 2 (count 8); two counts of sexual penetration with Jane Doe No. 1 (§ 288.7, subd. (b); counts 5 & 6) and one count with Jane Doe No. 2 (count 9). Defendant was also convicted of committing a lewd act on Jane Doe No. 1 (§ 288.7, subd. (a); count 7) and Jane Doe No. 2 (count 10), and the jury found defendant committed each lewd act offense on more than one victim (§ 667.61, subds. (b), (e)).

The court sentenced defendant to state prison for a total term of 80 years to life, comprised of two terms of 25 years to life (counts 1 & 10) and two consecutive terms of 15 years to life (counts 2 & 9). The court imposed concurrent indeterminate terms on the remaining counts: concurrent terms of 15 years to life on counts 3 through 6 and count 8 and a concurrent term of 25 years to life on count 7.

On appeal, defendant contends: (1) the evidence was insufficient to support his convictions in counts 8 through 10 and the multiple victim enhancements on counts 7 and 10; (2) the court erred by admitting expert testimony explaining child sexual abuse accommodation syndrome (CSAAS); (3) when instructing the jury on its consideration of the CSAAS evidence, the court erred by failing to omit the last sentence of CALCRIM No. 1193; (4) the prosecutor committed misconduct in her rebuttal argument; (5) his attorney rendered ineffective assistance; (6) his sentence constitutes cruel and unusual punishment; and (7) the court violated his due process rights by imposing certain fines

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

2

and fees without first determining his ability to pay them.  We reject these contentions and affirm.


FACTS

D.F. had seven children, two of whom were girls.  D.F.'s mother V. was married to defendant.  Around 2011, V. began babysitting the children at the home she shared with defendant while D.F. was at work.  V. would ensure the school-age children, including Jane Doe No. 1, got to school and would take care of them when they returned from school in the afternoon until their mother picked them up in the evening.  Jane Doe No. 2 was too young for school so she would stay at her grandmother and defendant's house all day; she also spent most nights there.


*Jane Doe No. 1* (*Counts 1 through 7*)

Jane Doe No. 1 was about seven years old when her grandmother began watching her and her siblings.  Every day after school, she would go to her grandmother's house.  Defendant would be home also.

A couple of times a week, her grandmother would leave the house to run errands or pick up one of the children from school, entrusting defendant to watch Jane Doe No. 1 and the other children at the house.  Defendant would take Jane Doe No. 1 into his bedroom and molest her when her grandmother was out of the house.  With the bedroom door closed and locked, he would rub her vaginal area with his finger and tell her to lick his penis like it was a lollipop.  On a couple of occasions, he orally copulated her and touched her breasts.  Sometimes when he had her lay down on the bed, he would pull down her pants, lay on top of her, and place his penis inside her labia majora.  Eventually he developed a pattern where he would digitally penetrate her while he had

3

her orally copulate him, before getting on top of her on the bed. This abuse occurred frequently over a period of years.

While the abuse occurred mostly in the bedroom, defendant also touched Jane Doe No. 1's vaginal area once while they were in the garage and another time by a shed in the backyard.

Jane Doe No. 1 did not tell anyone defendant was molesting her because she was scared. She finally reported the abuse when she was 10 years old, after she saw something suspicious between defendant and her younger sister and asked Jane Doe No. 2 if defendant was touching her inappropriately. When Jane Doe No. 2 confirmed defendant was molesting her, Jane Doe No. 1 informed members of their family, who told her mother.

Her mother called the police. In a statement to the police and during her Child Abuse Services Team (CAST) interview, Jane Doe No. 1 described the abuse defendant had perpetrated upon her for years.

*Jane Doe No. 2* (*Counts 8 through 10*)

Jane Doe No. 2 was about 19 months old when she went to live with her grandmother and defendant. Defendant would molest her when her grandmother left the house. He would take her into his bedroom, put her on the bed, pull down her pants, and digitally penetrate her. Sometimes he would tell her not to tell anyone. When her grandmother returned home, he would hurry her out of the room. He also molested her in the shed in the yard a few times.

Jane Doe No. 2 did not tell anyone about the abuse until her sister asked if defendant had touched one of her private places. After she said yes, her sister confided defendant had been molesting her also.

4

Jane Doe No. 2 did not remember some of the statements she made during her CAST interview, which was later played for the jury. She was five years old when the interview took place. During the interview, Jane Doe No. 2 stated defendant molested her on numerous occasions by pulling her into his bedroom and locking the door. She described his actions of digitally penetrating her, having her orally copulate him, and putting his penis on her "private" part. She also described him rubbing her breasts and touching her buttocks.

When the interviewer showed her a picture of defendant, Jane Doe No. 2 said she wanted her "grampe back." She also told the interviewer that she felt "good" about going to her grandmother and defendant's house.

About a year prior to the trial, Jane Doe No. 2 told the police she was abused by another man, D.V., when she was very young. Jane Doe No. 2 had lived with defendant's sister and brother-in-law, D.V., for about 18 months beginning when she was around one-and-a-half-months old. She reported that during this time, D.V. had put her on a bed and touched her private area with his finger. She said that when she tried to resist, he pushed her back down. She told the interviewer that she talked to another girl who was at the house and she was being hurt too.

At trial, Jane Doe No. 2 did not remember making this accusation against D.V. or the details of it and testified she did not believe the abuse happened. However, after the defense played a video recording of her being interviewed by the police, she testified she believed D.V. abused her, but she could not remember the interview. After watching the video, she testified she told her mother that D.V. was touching her inappropriately and that her mother stopped taking her there. D.F. denied that Jane Doe No. 2 told her about the abuse back then.

5

*CSAAS*

Dr. Ward, a clinical and forensic psychologist, explained CSAAS describes a pattern of behaviors exhibited by children who have been sexually abused. It is not a diagnostic tool and cannot be used to diagnose whether or not sexual abuse has occurred. It was developed to be used in a clinical setting to help clinicians understand a child's behavioral responses when sexual abuse occurs within an ongoing relationship.

Dr. Ward described the five stages of CSAAS: (1) secrecy; (2) helplessness; (3) entrapment and accommodation; (4) delayed, unconvincing disclosure; and (5) retraction or recantation. All five components are not present in all cases involving sexually abused children. Secrecy and helplessness are always present but the others may not be. Secrecy refers to the fact the sexual abuse occurs in secret and that children tend to keep the abuse secret for a long time. Helplessness refers to the inherent power differential between the abused child and the abusive adult. Entrapment and accommodation concern a child's inability to get out of the abusive situation, resulting in the child becoming entrapped and having to accommodate the abuse. A child may acquiesce or go along with the sexual abuse because the child believes he or she has to put up with this negative aspect of the relationship with the abuser to receive the positive benefits of the relationship. It can be very confusing for a child when a person providing the child positive emotional support is also sexually abusing him or her.

Delayed and unconvincing disclosure is the most widely researched aspect of CSAAS. The research indicates most people do not report sexual abuse until adulthood. The initial disclosure may be tentative or only reveal a little information to see how it is received. Whether the child reveals more depends on the listener's reaction. Retraction and recantation may occur after a disclosure has turned the child's life upside down as the child wants things to return to the way they were.

6

DEFENSE EVIDENCE

Testifying in his own defense, defendant denied any inappropriate or sexual contact with either girl. He interacted with the children while his wife was babysitting them but he was never alone with the girls. Defendant was very busy because he was overseeing a Christian men's recovery home at the residence, which housed approximately 15 men. The men ate and had meetings in the house and their sleeping quarters were in the garage.

A friend of defendant's and two former residents of his recovery home testified in his defense. All three had lived at defendant's residence for periods of time during which the abuse occurred. None of them saw defendant alone with either of the girls, nor did they see anything out of the ordinary in his interaction with the girls. They could not recall a time when the children's grandmother left the house while the children were there. Each expressed his opinion that defendant was an honest man who would never harm a child.

Defendant was interviewed and tested by a forensic psychologist. The test indicated defendant does not have a persistent sexual interest in adolescent females.

## DISCUSSION

SUFFICIENCY OF THE EVIDENCE

Defendant contends there was an absence of substantial evidence supporting his convictions involving Jane Doe No. 2 (counts 8, 9, and 10) and the multiple victim enhancements (counts 7 and 10). Defendant's argument does not challenge the evidence for any particular element of these offenses or enhancements; instead, he focuses on inconsistencies between her testimony and prior statements and makes a broad claim that Jane Doe No. 2's testimony was unbelievable and should be

7

completely disregarded.  Essentially, defendant is rearguing the evidence presented at trial attacking Jane Doe No. 2's credibility.  We reject this argument.

"In deciding the sufficiency of the evidence, a reviewing court resolves neither credibility issues nor evidentiary conflicts.  [Citation.]  Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact."  (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)  Our role, instead, is to "'review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'  [Citation.]  In determining whether a reasonable trier of fact could have found [the defendant] guilty beyond a reasonable doubt, we presume in support of the judgment "'the existence of every fact the trier could reasonably deduce from the evidence."'"  (*People v. Nelson* (2016) 1 Cal.5th 513, 550.)  The same standard applies when examining the sufficiency of the evidence supporting an enhancement or alternative sentencing scheme.  (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60.)

"[U]nless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction."  (*People v. Young, supra*, 34 Cal.4th at p. 1181.)  "'""To warrant the rejection of the statements given by a witness who has been believed by a trial court, there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions."'"  (*People v. Ennis* (2010) 190 Cal.App.4th 721, 728.)  "While an appellate court can overturn a judgment when it concludes the evidence supporting it was 'inherently improbable,' such a finding is so rare as to be almost nonexistent."  (*Ibid.*)  This case is not one of those rare instances.

Defendant challenges the sufficiency of the evidence by highlighting various inconsistencies between Jane Doe No. 2's initial statement to the police, her CAST interview, and the testimony at trial.  He also focuses on the impeachment of Jane

8

Doe No. 2's allegation that she was sexually abused by a different man, D.V., when she was very young, and he calls her allegation of prior abuse "incredulous." Defense counsel similarly attacked Jane Doe No. 2's credibility in his closing argument as he urged the jury to reject her testimony.

The impeachment of Jane Doe No. 2's testimony was an issue for the jury to consider in evaluating her credibility. (*People v. Maciel* (2013) 57 Cal.4th 482, 519 ["'"'it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends"'"'"].) In convicting defendant of the charges and enhancements, the jury found credible Jane Doe No. 2's statements and testimony that defendant committed multiple sex acts on her. We cannot and will "not substitute our evaluation of a witness's credibility for that of the fact finder." (*People v. Jones* (1990) 51 Cal.3d 294, 314.)

Even if the jury found incredible Jane Doe No. 2's allegation of prior abuse by D.V., it could still find credible the evidence that *defendant* sexually abused her. (See CALCRIM No. 226 [instructing the jury it "may believe all, part, or none of any witness's testimony"].) The evidence that defendant took Jane Doe No. 2 into his bedroom and sexually abused her on multiple occasions was not "improbable '"on its face."'" (*People v. Ennis, supra*, 190 Cal.App.4th at p. 729.)

To the extent defendant asserts the evidence against him was insufficient because the prosecution failed to present physical evidence and testimony to corroborate Jane Doe No. 2's allegations, we disagree. First, "California law does not require corroboration of the testimony of a child sexual abuse victim." (*People v. Harlan* (1990) 222 Cal.App.3d 439, 454; accord, CALCRIM No. 1190 [sexual assault conviction may be based solely on the testimony of the victim]; CALCRIM No. 301 [single witness's testimony can prove any fact].) Second, Jane Doe No. 2's testimony, describing the sexual acts defendant performed on her and had her perform in his bedroom, was corroborated by her sister's testimony, describing the same acts in the same location.

9

Viewing the evidence in the light most favorable to the judgment, as we must, we conclude the evidence was sufficient to support defendant's convictions.

EXPERT TESTIMONY DISCUSSING CSAAS

Defendant mounts a multi-pronged attack on the court's admission of Dr. Ward's expert testimony concerning CSAAS. Initially, he takes the "position that CSAAS evidence should be deemed inadmissible in California for all purposes based on the fact that such evidence cannot be limited to the description of myths surrounding abuse." He encourages us to "follow the lead of two other states and adopt a rule excluding CSAAS evidence in its entirety." If we are unwilling to do so, and we are, he contends the evidence should have been excluded because it "constituted scientific opinion evidence without reliable foundation under *Kelly/Frye*."[2] Next, he challenges its admission as irrelevant evidence that is not the proper subject of expert testimony because "there are no longer misconceptions about how child sexual abuse victims should act." He further contends the evidence should have been excluded under Evidence Code section 352 because it was more prejudicial than probative. Last, he asserts admission of the CSAAS evidence violated his state and federal constitutional rights to due process. Defendant's attack fails on all fronts.

---

[2] In *People v. Kelly* (1976) 17 Cal.3d 24, our Supreme Court explained California had adopted the test enunciated in *Frye v. United States* (D.C. Cir. 1923) 293 Fed. 1013, 1014, for evaluating the admissibility of evidence relating to a new scientific technique. (*Kelly*, at p. 30.) For many years, the test was referred to in California as the "'*Kelly/Frye*' test." (*People v. Diaz* (1992) 3 Cal.4th 495, 525.) The *Frye* test was later "superseded by the adoption of the Federal Rules of Evidence." (*Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993) 509 U.S. 579, 587.) Our Supreme Court has since indicated the test is "now more accurately" called the "*Kelly* formulation." (*People v. Leahy* (1994) 8 Cal.4th 587, 591.) Accordingly, we will refer to it as such or the *Kelly* rule.

*Trial Court Proceedings*

Prior to trial, the prosecution moved to admit expert testimony regarding CSAAS to dispel common misconceptions the jurors might have about how a child will react to sexual abuse. The prosecutor argued such testimony was relevant to help the jury understand an abused child might not immediately report the abuse and could continue to show affection toward her abuser. With no objection from the defense, the court granted the prosecution's motion. The defense later registered an objection to the expert testimony on CSAAS "for the record . . . on a foundation ground and a[n Evidence Code section] 352 ground," acknowledging the court had already granted the prosecution's motion to allow the testimony.

*Admissibility of CSAAS Expert Testimony in California*

Defendant contends "CSAAS evidence should be deemed inadmissible in California for all purposes . . . ." He acknowledges numerous California appellate court decisions have found CSAAS testimony admissible. (See, e.g., *People v. Munch* (2020) 52 Cal.App.5th 464, 465; *People v. Perez* (2010) 182 Cal.App.4th 231, 245; *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744-1745; *People v. Housley* (1992) 6 Cal.App.4th 947, 955-956; *People v. Gray* (1986) 187 Cal.App.3d 213, 217-220.) Nevertheless, he urges us to break from these cases and to follow Kentucky and Tennessee by adopting a rule excluding CSAAS evidence. (See, e.g., *Newkirk v. Commonwealth* (Ky. 1997) 937 S.W.2d 690, 691-694; *State v. Bolin* (Tenn. 1996) 922 S.W.2d 870, 872-874.) He asserts such a rule is necessary because there is a danger CSAAS evidence may be misunderstood or misapplied by the jury. We disagree and see no reason to break from well-established authority in California.

In California, "it has long been held that in a judicial proceeding presenting the question whether a child has been sexually molested, CSAAS is admissible evidence for the limited purpose of disabusing the fact finder of common misconceptions it might

11

have about how child victims react to sexual abuse." (*In re S.C.* (2006) 138 Cal.App.4th 396, 418 [cases cited therein].) As our Supreme Court has explained, expert testimony on CSAAS "is not admissible to prove that the complaining witness has in fact been sexually abused;" but "it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting— is inconsistent with his or her testimony claiming molestation." (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300 (*McAlpin*).) "'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.'" (*Id.* at p. 1301.)

In *McAlpin*, our Supreme Court was not ruling directly on the admissibility of expert testimony on CSAAS but discussed it when considering the admissibility of similar evidence—expert testimony on the behavior of a molested child's parent. (*McAlpin, supra*, 53 Cal.3d at pp. 1299-1302.) The *McAlpin* court relied on the admissibility of expert testimony discussing CSAAS to explain its conclusion that the trial court properly admitted expert testimony on why a parent might not immediately report sexual abuse of his or her child. (*Ibid.*) In doing so, the Supreme Court cited with approval several Court of Appeal decisions that had upheld the admission of CSAAS expert testimony. (*Id.* at pp. 1300-1301 & fn. 4.).

Similarly, in *People v. Humphrey* (1996) 13 Cal.4th 1073, the Supreme Court analogized to CSAAS evidence in concluding expert testimony regarding battered women's syndrome was relevant and admissible "'to explain a behavior pattern that might otherwise appear unreasonable to the average person'" and "''to disabuse jurors of commonly held misconceptions . . . .'''" (*Id.* at p. 1088.) Facing a similar question in *People v. Brown* (2004) 33 Cal.4th 892, the Supreme Court again noted the relevance and admissibility of expert testimony that can dispel common misconceptions about how an alleged domestic violence victim should behave. In its analysis, the Supreme Court

12

relied on Court of Appeal decisions upholding the admissibility of CSAAS expert testimony and *McAlpin*. (*Brown*, at pp. 905-907.)

Our Supreme Court's discussions in *McAlpin*, *Humphrey*, and *Brown* of the relevance of CSAAS expert testimony are persuasive dicta we dare not disregard. (*People v. Wade* (1996) 48 Cal.App.4th 460, 467 ["Dicta of our Supreme Court are highly persuasive"]; see *Hubbard v. Superior Court* (1997) 66 Cal.App.4th 1163, 1169 ["When the Supreme Court has conducted a thorough analysis of the issues and such analysis reflects compelling logic, its dictum should be followed"].) While defendant relies on cases from two sister states that held CSAAS evidence is inadmissible, these cases are not binding on us and do not convince us to break from established California authority. (*T.H. v. Novartis Pharmaceuticals Corp.* (2017) 4 Cal.5th 145, 175 [decisions of sister states are not controlling].) Indeed, the overwhelming majority of states are in alignment with California and permit CSAAS expert testimony for some purpose. (See *People v. Munch, supra*, 52 Cal.App.5th at pp. 469-472 [examining several out of state cases]; *id*. at p. 472 [concluding "the vast majority of jurisdictions" are consistent with California]; *King v. Commonwealth* (Ky. 2015) 472 S.W.3d 523, 534-535 (dis. opn. of Abramson, J.) [compiling cases and concluding 41 states and several federal circuits admit CSAAS expert testimony for some purpose, while seven states have not addressed the issue].) Accordingly, we decline to depart from settled California law that CSAAS is admissible to disabuse jurors of common misconceptions regarding sexually abused children.

*Defendant Forfeited His Contention That the CSAAS Expert Testimony Is Scientific Evidence Subject to* Kelly

Defendant argues the CSAAS expert testimony should have been excluded because it is scientific evidence subject to the *Kelly* formulation and it cannot satisfy *Kelly* because its scientific validity "is subject to considerable ongoing debate." The

13

Attorney General asserts defendant forfeited this argument by failing to raise it below. We agree with the Attorney General.

Under the *Kelly* formulation for the admissibility of scientific evidence, "evidence obtained through a new scientific technique may be admitted only after its reliability has been established under a three-pronged test. The first prong requires proof that the technique is generally accepted as reliable in the relevant scientific community." (*People v. Bolden* (2002) 29 Cal.4th 515, 544.) Below, defendant neither objected to the admission of Dr. Ward's expert testimony concerning CSAAS on the ground that it was new scientific evidence subject to the *Kelly* rule nor did he challenge its acceptance in the scientific community. By failing to raise these objections below, he forfeited his appellate claim. (Evid. Code, § 353, subd. (a); *People v. Ochoa* (1998) 19 Cal.4th 353, 414 [failure to object to the admission of evidence on *Kelly* grounds forfeits appellate claim].)

Addressing the merits of defendant's argument to forestall a habeas claim that his counsel's failure to object constituted ineffective assistance, we conclude CSAAS expert testimony is not subject to the *Kelly* formulation. "'Court of Appeal decisions have held that *Kelly-Frye* [citations] . . . precludes an expert from testifying based on the child sexual abuse accommodation syndrome (CSAAS) that a particular victim's report of alleged abuse is credible because the victim manifests certain defined characteristics which are generally exhibited by abused children.'" (*People v. Wells* (2004) 118 Cal.App.4th 179, 188.) But where the CSAAS evidence is admitted to rehabilitate a victim's credibility through a discussion of victim behavior as a class and does not diagnosis or discuss the victim in that case, cases have held CSAAS is not subject to the requirements of the *Kelly* rule. (*People v. Munch, supra*, 52 Cal.App.5th at p. 473; *People v. Gray, supra*, 187 Cal.App.3d at pp. 217-220; *People v. Harlan, supra*, 222 Cal.App.3d at pp. 448-449.)

14

In defendant's case, Dr. Ward's expert testimony on CSAAS did not constitute a new scientific method of proof which purported to provide any "definitive truth" regarding whether the victims had been molested (*People v. Stoll* (1989) 49 Cal.3d 1136, 1156) and therefore was not subject to the *Kelly* rule.  (See *People v. Jones* (2013) 57 Cal.4th 899, 953 [absent "'some special feature which effectively blindsides the jury, expert opinion testimony is not subject to *Kelly*'"].)  Thus, there was no error on this ground.

*The CSAAS Evidence was Relevant and Admissible*

Next, defendant contends the court should have excluded Dr. Ward's testimony explaining CSAAS based on irrelevancy.  He asserts the expert testimony was irrelevant because "[t]he misconceptions for which CSAAS is admitted to refute are no longer present."  Much of this argument is a rephrasing of his earlier argument that CSAAS should be excluded in California for all purposes.  Again, we disagree.

The Attorney General argues defendant forfeited this claim because, below, defendant neither objected to Dr. Ward's testimony as irrelevant nor argued CSAAS was no longer the proper subject of expert testimony.  It is well-established "'that the "defendant's failure to make a timely and specific objection" on the ground asserted on appeal makes that ground not cognizable.'" (*People v. Partida* (2005) 37 Cal.4th 428, 434; accord, Evid. Code, 353, subd. (a).)

Defendant admits he did not object on this ground.  Nevertheless, he contends his claim is preserved for appeal because his "objection under Evidence Code section 352 necessarily included a broad challenge to the relevance of the CSAAS evidence . . . ."  We are not persuaded.  Defendant's objection in the trial court was insufficient to make the court aware of his current contention that the expert testimony on CSAAS was entirely irrelevant and should be excluded because the behaviors of child sex abuse victims are now commonly understood.  (See, e.g., *People v. Barnett* (1998) 17

15

Cal.4th 1144, 1130 [objection on relevancy grounds did not preserve Evid. Code, § 352 argument].) Nevertheless, we address defendant's claim on its merits to forestall a habeas corpus petition alleging ineffective assistance of counsel, and we conclude the evidence was relevant and admissible.

"Opinion testimony by an expert witness is admissible if it is, inter alia, '[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact' [citation]." (*McAlpin, supra*, 53 Cal.3d at p. 1299.) Expert testimony, like all evidence, must be relevant. (Evid. Code, § 350; *McAlpin*, at p. 1303.) "'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness . . . , having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) "'[T]he trial court is vested with wide discretion in determining relevance' under the Evidence Code" (*McAlpin*, at p. 1303), and its decision "to admit expert testimony 'will not be disturbed on appeal unless a manifest abuse of discretion is shown'" (*id.* at p. 1299).

Expert testimony explaining CSAAS may be admitted in the prosecution's case-in-chief when the victim's testimony raises an "obvious question . . . in the minds of the jurors," such as "why the molestation was not immediately reported if it had really occurred" or "why [the victim] went back to [the defendant's] home a second time after the first molestation." (*People v. Patino, supra*, 26 Cal.App.4th at p. 1745.) Generally, CSAAS evidence "is pertinent and admissible if an issue has been raised as to the victim's credibility." (*Ibid.*)

Here, the court did not abuse its discretion by admitting Dr. Ward's expert testimony regarding CSAAS. This testimony was relevant to the jury's consideration of the victims' credibility. The girls' behavior of not immediately reporting the abuse to their grandmother or mother and not avoiding being alone with defendant after the abuse began could have raised serious questions in the jurors' minds as to the veracity of the

16

girls' claims of abuse. Similarly, Jane Doe No. 2's exclamation during her CAST interview that she wanted her "grampe back" could have seemed irreconcilable with her allegations that defendant had repeatedly molested her and could have caused the jurors to question her credibility. Dr. Ward's testimony explaining CSAAS was relevant to dispel misconceptions the jurors might have held that a child subjected to sexual abuse by a family member would immediately report the abuse, avoid the abuser, or not show affection for the abuser.

Defendant contends the CSAAS evidence was irrelevant in his trial because he did not dispute that child victims delay in reporting abuse or argue that an abused child would not show affection for the abuser. That defendant did not make these arguments to the jury does not mean that questions regarding the girls' paradoxical behavior would not arise in the jurors' minds when evaluating their credibility.

Defendant further asserts "cable television, the internet, and social media" have educated Californians regarding the behavior of sexual assault victims and, therefore, expert testimony explaining CSAAS is no longer relevant. We question the definitude of defendant's supposition. Nevertheless, "'the admissibility of expert opinion is a question of degree. The jury need not be wholly ignorant of the subject matter of the opinion in order to justify its admission." (*McAlpin, supra*, 53 Cal.3d at p. 1299.) Expert testimony is admissible "'whenever it would "assist" the jury.'" (*Id.* at p. 1300.) Here, Dr. Ward's expert testimony on CSAAS was admissible as it aided the jury in assessing the victims' credibility. Accordingly, we conclude there was no error on this ground either.

*Evidence Code Section 352 Did Not Bar Admission of the Expert Testimony on CSAAS*

Defendant contends the court should have excluded Dr. Ward's expert testimony on CSAAS under Evidence Code section 352. He asserts "[e]xpert testimony on CSAAS is more prejudicial than probative because it encourages the jury to conclude

17

that because a child exhibits symptoms consistent with CSAAS, the defendant is more likely to have committed the charged crime(s)." We conclude there was no error.

Evidence Code section 352 provides for the exclusion of evidence "if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." We review a trial court's decision concerning the admissibility of evidence under Evidence Code section 352 for an abuse of discretion. (*People v. Barnett, supra*, 17 Cal.4th at p. 1118.)

Defendant's contention that the CSAAS expert testimony was not probative is a rehash of his prior assertions—"there are no longer generally held misconceptions about how a child victim of sexual abuse should act" and CSAAS is "junk science" that has not "been accepted as generally reliable in the scientific community." We have already rejected these assertions and need not repeat our discussion here. Suffice it to say, Dr. Ward's expert testimony on CSAAS was probative.

Nor does defendant persuade us the CSAAS evidence was unduly prejudicial. Dr. Ward began her testimony by explaining she knew none of the facts of defendant's case, including the number of victims, their names or gender. She testified generally about the stages of CSAAS, describing how some children can respond to sexual abuse by a person known to them. She explained CSAAS is not a diagnostic tool for determining whether a child has been sexually abused. She did not discuss the victims or apply CSAAS to their behavior. Dr. Ward made it clear CSAAS cannot be used to determine whether sexual abuse actually occurred. The jury was free to determine on its own whether the girls' self-impeaching behavior was the result of CSAAS or indicated their allegations of abuse were fabricated.

Moreover, the court instructed the jury with CALCRIM No. 1193, as discussed *post*, admonishing the jury concerning its consideration of the CSAAS testimony. This instruction told the jurors that Dr. Ward's testimony about CSAAS was

18

not evidence defendant committed any of the charged crimes and that it could only be considered in deciding whether the victims' conduct was not inconsistent with the conduct of someone who had been molested and in evaluating the believability of their testimony.

We conclude the court did not abuse its discretion by admitting Dr. Ward's CSAAS testimony over defendant's Evidence Code section 352 objection.

*The Admission of the CSAAS Evidence Did Not Violate Defendant's Due Process Rights*

Having concluded the court made a reasoned judgment that the CSAAS expert testimony was admissible and not more prejudicial than probative, we conclude its admission did not violate defendant's constitutional right to a fair trial. (See *People v. Patino, supra*, 26 Cal.App.4th at p. 1747 ["introduction of CSAAS testimony does not by itself deny appellant due process"]; see also *Estelle v. McGuire* (1991) 502 U.S. 62, 70 [admission of relevant evidence of battered child syndrome did not violate the defendant's due process rights].)

CALCRIM No. 1193

Defendant contends the court committed reversible error by failing to excise the last sentence of CALCRIM No. 1193, the instruction given to the jury on its limited use of Dr. Ward's expert testimony on CSAAS. As given, CALCRIM No. 1193 instructed the jury: "You have heard testimony from Dr. Jody Ward regarding child sexual abuse accommodation syndrome. [¶] Dr. Jody Ward's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not [Jane Doe No. 1]'s and/or [Jane Doe No. 2]'s conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of either of their testimony." Defendant asserts the last sentence of "the

19

instruction inadequately explained the principles of CSAAS testimony, and effectively instructed the jury that it could consider such testimony as evidence of [his] guilt." We disagree.

*Forfeiture*

In the trial court, defendant only objected to a portion of the instruction's last sentence—the language telling the jurors they could consider the CSAAS evidence in deciding whether the victims' "conduct was not inconsistent with the conduct of someone who had been molested." (CALCRIM No. 1193.) Defendant proposed the last sentence of the instruction should instead read: "You may consider this evidence only in evaluating the believability of either of [the girls'] testimony."

Because defendant's objection in the trial court varies from his appellate claim, the Attorney General argues defendant forfeited his claim of instructional error. Defendant makes two points in response. First, he asserts the instruction affected his substantial rights and is therefore reviewable on appeal without an objection below. (§ 1259; *People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249 ["Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim—at least to the extent of ascertaining whether the asserted error would result in prejudice if error it was"].) Second, he contends if the issue is deemed forfeited on appeal then his trial counsel rendered constitutionally ineffective assistance by failing to object to the last sentence of the instruction in its entirety. Considering defendant's claim on its merits, we conclude the court properly instructed the jury with CALCRIM No. 1193. Therefore, we reject defendant's ineffective assistance of counsel claim. (*People v. Price* (1991) 1 Cal.4th 324, 387 ["Counsel does not render ineffective assistance by failing to make" a futile objection].)

20

*The Jury Was Properly Instructed*

"""It is fundamental that jurors are presumed to be intelligent and capable of understanding and applying the court's instructions." [Citation.]' [Citation.] ""A defendant challenging an instruction as being subject to erroneous interpretation by the jury must demonstrate a reasonable likelihood that the jury understood the instruction in the way asserted by the defendant. [Citations.]' [Citation.] "'[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction."""" (*People v. Covarrubias* (2016) 1 Cal.5th 838, 905.)

Defendant's argument focuses on the last sentence of CALCRIM No. 1193. He contends this sentence permitted the jury to use Dr. Ward's expert testimony as evidence that he committed the crimes because it allowed the jury to consider the CSAAS evidence in evaluating the believability of the girls' testimony. A similar challenge to CALCRIM No. 1193 was rejected in *People v. Gonzales* (2017) 16 Cal.App.5th 494 (*Gonzales*).

In *Gonzales*, as here, the defendant argued "it is impossible" for a juror "to use the CSAAS testimony to evaluate the believability of [the victim]'s testimony without using it as proof that [the defendant] committed the charged crimes." (*Gonzales, supra*, 16 Cal.App.5th at p. 503.) Rejecting this argument, the *Gonzales* court explained: "[T]he instruction must be understood in the context of Ward's testimony. Ward testified that CSAAS is not a tool to help diagnose whether a child has actually been abused. She said that if it is not known whether a child has been abused, CSAAS is not helpful in determining whether a child has, in fact, been abused. The purpose of CSAAS is to understand a child's reactions when they have been abused. [¶] A reasonable juror would understand CALCRIM No. 1193 to mean that the jury can use Ward's testimony to conclude that [the victim]'s behavior does not mean she lied when she said she was abused. The jury also would understand it cannot use Ward's testimony to conclude [the

21

victim] was, in fact, molested. *The CSAAS evidence simply neutralizes the victim's apparently self-impeaching behavior.* Thus, under CALCRIM No. 1193, a juror who believes Ward's testimony will find both that [the victim]'s apparently self-impeaching behavior does not affect her believability one way or the other, and that the CSAAS evidence does not show she had been molested. There is no conflict in the instruction." (*Id.* at pp. 503-504, italics added.)

Defendant asserts *Gonzales* was wrongly decided and should not be followed. We disagree. CALCRIM No. 1193 properly limits the jury's consideration of CSAAS evidence to its permissible purpose. The instruction is consistent with *McAlpin, supra*, 53 Cal.3d 1289, as it explains the expert testimony on CSAAS is not evidence that the defendant committed the charged crimes but can be considered in evaluating a child's credibility when the child's conduct "is inconsistent with his or her testimony claiming molestation." (*Id.* at p. 1300.)

Reading the instruction as a whole, it is not reasonably likely the jury understood CALCRIM No. 1193 as allowing it to use the evidence for the impermissible purpose of determining that Jane Doe No. 1 and/or Jane Doe No. 2 were molested by defendant. Instead, the jury most likely understood the instruction as permitting it to use the CSAAS evidence for the permissible purpose of evaluating the girls' believability in light of the evidence that they did not report the abuse for years and that Jane Doe No. 2 continued to express affection for defendant after she accused him of molesting her. The jury would have reasonably understood the CSAAS evidence was one of the factors it could consider in evaluating the girls' credibility and not evidence by itself that defendant was guilty of the charges.

Consistent with *Gonzales, supra*, 16 Cal.App.5th at pages 503-504, we conclude CALCRIM No. 1193 appropriately instructed the jury on the proper and impermissible use of Dr. Ward's expert testimony on CSAAS.

22

PROSECUTORIAL ERROR

Defendant asserts there were two instances of prejudicial error during the prosecutor's rebuttal argument that violated his state and federal constitutional rights to due process and a fair trial. He contends the prosecutor improperly argued defendant and his witnesses were biased and should not be believed. He also contends the prosecutor denigrated defense counsel by asserting he had fabricated evidence to create doubt. The Attorney General responds by arguing defendant forfeited his contentions by failing to request an admonition below and if not forfeited, defendant's contentions fail because "the prosecutor's argument was a fair comment on the evidence . . . ." We conclude defendant preserved his claim by objecting below, but there was no prosecutorial error.

*Trial Court Proceedings*

During her rebuttal argument, the prosecutor argued: "[Defense counsel] said you should look at all the evidence and I don't want you to look at all the evidence. I absolutely want you to look at all the evidence. [¶] But what I said was the evidence that came from that side of the table, was biased evidence. It was motivated evidence. Some of it was incredulous, and some of it was pretty transparent. [¶] You heard evidence from defense witnesses who have a friend sitting here. You heard from [defendant] himself, who obviously has a biased, motivated interest." Defense counsel objected the prosecutor was misstating the law, but the court overruled his objection.

Discussing the victims' credibility later in her rebuttal argument, the prosecutor argued: "This is not a hunt to doubt me. That is not your job. The defense attorney did his job. [Defense counsel] is an excellent attorney. I worked with him many times. That is his job. He has to try to create doubt." Defense counsel objected the argument was improper, but the court again overruled his objection. The prosecutor continued her argument: "He has to throw everything out there, see what sticks, and hope you will latch onto something."

23

Defense counsel expanded on his objections after the court finished instructing the jury: "Yes. I did make objections during rebuttal by [the prosecutor]. I do think that basically she was disparaging defense counsel when she said it is my job to create doubt, leaving the impression, and then coupled that with would throw things on the wall to see if it sticks, like I am manufacturing evidence. I think that it is basically disparaging defense counsel, which is not allowed. [¶] I also believe this idea that she gets to say of course he is biased because he is the defendant and of course he lied because he is a defendant, it is a clear misstatement of the law. [¶] He has a presumption of innocence, and it goes against the jury instruction on judging witness credibility. So, I think it is improper argument and it is totally misstating law."

The court explained it overruled the defense objections because it considered the prosecutor's argument to be within the permissible bounds of argument and it did not find the prosecutor's argument that defendant was biased to be a misstatement of the law. The prosecutor pointed out that she also said defense counsel was "an excellent attorney." Defense counsel retorted: "You can say, yeah, he did a great job, great job, and then—but then say these things like but it is his job to create doubt, his job to throw things on the wall and see what sticks. You're also saying he did a great job of manufacturing evidence. [It's] basically what you're saying." The court disagreed and reiterated its ruling that the prosecutor's argument was "fair."

*Forfeiture*

We first address the Attorney General's argument that defendant forfeited his claims of prosecutorial error by failing to request an admonition after objecting below. "Generally, a claim of prosecutorial misconduct is preserved for appeal only if the defendant objects in the trial court and requests an admonition, or if an admonition would not have cured the prejudice caused by the prosecutor's misconduct." (*People v. Ledesma* (2006) 39 Cal.4th 641, 726.) "Forfeiture for failure to request an admonition

24

will also not apply where the trial court immediately overruled the objection to the alleged misconduct, leaving defendant without an opportunity to request an admonition." (*People v. Panah* (2005) 35 Cal.4th 395, 462.)

Here, defendant objected to the two claimed instances of prosecutorial error, and on each occasion, the court immediately overruled the defense objection, signaling it found the prosecutor's argument appropriate. Defendant did not forfeit his claims of prosecutorial error by failing to request an admonition under these circumstances. Because we address defendant's contentions on their merits and conclude there was no prosecutorial error, we reject his alternative claim that his counsel's failure to request an admonition constituted ineffective assistance.

*There Was No Prosecutorial Error*

"'The applicable federal and state standards regarding prosecutorial misconduct are well established. "'A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process."'" [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ""'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury."'""'" (*People v. Hill* (1998) 17 Cal.4th 800, 819.) "[A] determination of bad faith or wrongful intent by the prosecutor is not required for a finding of prosecutorial misconduct." (*People v. Crew* (2003) 31 Cal.4th 822, 839.) When evaluating a defendant's claim of prosecutorial error, we ask whether it appears "reasonably likely in the context of the whole argument and instructions that '"the jury understood or applied the complained-of comments in an improper or erroneous manner."'" (*People v. Winbush* (2017) 2 Cal.5th 402, 480.)

25

With these principles in mind, we consider defendant's contention that the prosecutor erred by arguing the defense witnesses were biased and defendant had a "biased, motivated interest" in the outcome of the trial. "'The prosecutor is permitted to urge, in colorful terms, that defense witnesses are not entitled to credence, . . . [and] to argue on the basis of inference from the evidence that a defense is fabricated . . . .'" (*People v. Tafoya* (2007) 42 Cal.4th 147, 182.) Defendant asserts the prosecutor's argument defendant was biased was prosecutorial error because it was not based on inferences that could be drawn from the evidence. We disagree. In his testimony, defendant acknowledged he was facing serious charges and was worried about the consequences if he was convicted of one or more of the charges. The prosecutor's argument was consistent with CALCRIM No. 226, which described factors the jury could consider when evaluating a witness's credibility. CALCRIM No. 226 told the jury it could consider whether "the witness's testimony [was] influenced by a factor such as bias or prejudice, a personal relationship with someone involved in the case, or a personal interest in how the case is decided."

The case against defendant hinged on credibility—the victims' versus his. In closing arguments, each party strenuously argued its witnesses were credible and the other parties were not. Here, the prosecutor was urging the jury to consider the defense witnesses' relationship with defendant and defendant's interest in the outcome of the trial when evaluating the defense evidence. The prosecutor's comments did not constitute prosecutorial error.

Without any analysis and almost no authority, defendant further asserts the prosecutor's argument that defendant and his witnesses were biased undermined his presumption of innocence and "constituted implicit vouching for the credibility of the alleged victims." We deem this contention forfeited. (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785.) In any event, the prosecutor's argument that defendant

26

had a biased, motivated interest in the case was a fair comment and neither undermined defendant's presumption of innocence nor constituted vouching for the girls' credibility.

Defendant also contends the prosecutor erred by arguing that defense counsel "has to try to create doubt" and "has to throw everything out there, see what sticks, and hope you will latch onto something." He asserts this portion "of the prosecutor's argument effectively informed the jury that defense counsel had manufactured evidence in an effort to create doubt regarding [defendant]'s guilt of the charged offenses." We simply do not read the prosecutor's argument as defendant does.

The prosecutor has wide latitude to make vigorous arguments, as long as those arguments amount to a fair comment on the evidence, including reasonable inferences or deductions to be drawn from the evidence. (*People v. Williams* (1997) 16 Cal.4th 153, 221.) But "[p]ersonal attacks on the integrity of opposing counsel can constitute misconduct. [Citation.] 'It is generally improper for the prosecutor to accuse defense counsel of fabricating a defense [citations], or to imply that counsel is free to deceive the jury [citation]. Such attacks on counsel's credibility risk focusing the jury's attention on irrelevant matters and diverting the prosecution from its proper role of commenting on the evidence and drawing reasonable inferences therefrom.' [Citation.] However, 'the prosecutor has wide latitude in describing the deficiencies in opposing counsel's tactics and factual account.'" (*People v. Winbush, supra*, 2 Cal.5th at p. 484.)

Viewing the prosecutor's comments in the context of the arguments below, we see no prosecutorial error. The prosecutor's comments came in response to the defense argument attacking Jane Doe No. 2's credibility. In his closing argument, defense counsel asserted Jane Doe No. 2's allegations against defendant should not be believed because she had made a false abuse allegation against D.V. By trying to disprove Jane Doe No. 2's abuse allegation against D.V., the defense sought to create doubt as to defendant's guilt on the current charges. Defense counsel argued the evidence showed Jane Doe No. 2 lied, and he urged the jury to disregard all of her

27

testimony. The prosecutor's comments that defense counsel was trying to create doubt were directed at the defense strategy and not defense counsel personally. (See *People v. Medina* (1995) 11 Cal.4th 694, 759 [rejecting contention the "prosecutor demeaned defense counsel's integrity by observing 'any experienced defense attorney can twist a little, poke a little, try to draw some speculation, try to get you to buy something'"].)

Defendant's contentions of prosecutorial error fail.

CRUEL AND/OR UNUSUAL PUNISHMENT

Defendant contends his sentence of 80 years to life constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. We disagree.

*Sentencing Hearing*

At defendant's sentencing hearing, the court gave an indicated sentence of 80 years to life. The court stated it had carefully thought about the punishment to be imposed and intended to impose a punishment that would keep defendant in custody for the rest of his life. Defense counsel argued the court's indicated sentence constituted cruel and unusual punishment because it "does not reflect the crimes that are before the court, and would not reflect the person that [defendant] is." He reminded the court that several people stated defendant had a positive impact on their lives. Defense counsel argued defendant would have received "less time if he had killed [the victims]" and requested the court instead impose a sentence of 25 years to life.

Unmoved, the court imposed its indicated sentence. Defendant was sentenced to four consecutive, indeterminate terms: 25 years to life for sexual intercourse with Jane Doe No. 1 (count 1); 15 years to life for oral copulation with Jane Doe No. 1 (count 2); 15 years to life for sexual penetration with Jane Doe No. 2 (count 9); and 25 years to life for committing a lewd act on Jane Doe No. 2 (count 10) based on the

28

multiple victim enhancement. The court imposed concurrent indeterminate terms on defendant's six remaining convictions.

*Defendant's Sentence Does Not Constitute Cruel and Unusual Punishment Under the Eighth Amendment*

The Eighth Amendment to the United States Constitution, which protects a criminal defendant from the infliction of "cruel and unusual punishments," prohibits gross disproportionality between a crime and its punishment. (*Lockyer v. Andrade* (2003) 538 U.S. 63, 72-73.) "Embodied in the Constitution's ban on cruel and unusual punishments is the 'precept of justice that punishment for crime should be graduated and proportioned to [the] offense.'" (*Graham v. Florida* (2010) 560 U.S. 48, 59.) Reviewing United States Supreme Court precedent, our Supreme Court has explained: "'[T]he Eighth Amendment contains a "narrow proportionality principle," that "does not require strict proportionality between crime and sentence" but rather "forbids only extreme sentences that are 'grossly disproportionate' to the crime.""" (*In re Coley* (2012) 55 Cal.4th 524, 542.) But successful proportionality challenges are exceedingly rare. (*Harmelin v. Michigan* (1991) 501 U.S. 957, 1001 (*Harmelin*).)

"In considering a proportionality challenge to the length of a term-of-years sentence, 'the Court considers all of the circumstances of the case to determine whether the sentence is unconstitutionally excessive.' [Citation.] . . . 'The controlling opinion in *Harmelin* explained its approach for determining whether a sentence for a term of years is grossly disproportionate for a particular defendant's crime. A court must begin by comparing the gravity of the offense and the severity of the sentence. [Citation.] "[I]n the rare case in which [this] threshold comparison . . . leads to an inference of gross disproportionality" the court should then compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions. [Citation.] If this comparative

analysis "validate[s] an initial judgment that [the] sentence is grossly disproportionate," the sentence is cruel and unusual.'" (*People v. Christensen* (2014) 229 Cal.App.4th 781, 805-806 (*Christensen*).)

Defendant does not directly engage in such a proportionality analysis. Instead, relying on *Coker v. Georgia* (1977) 433 U.S. 584, 592, he contends his sentence violates the Eighth Amendment because it serves no legitimate penal purpose and "is the functional equivalent of life without the possibility of parole." Defendant's reliance on *Coker*, however, is misplaced. At issue in *Coker* was whether the Eighth Amendment prohibited capital punishment for the nonhomicide offense of rape of an adult. (*Id.* at p. 592.) *Coker* did not analyze a term-of-years sentence like that at issue here.

Noting he will not become eligible for parole until he is 130 years old, well beyond his life expectancy, defendant contends his sentence constitutes cruel and unusual punishment because it offends and shocks "the conscience of rational beings" and damages "the public's confidence in the penal system . . . ." Defendant's contention is based on Justice Mosk's concurring opinion in *People v. Deloza* (1998) 18 Cal.4th 585, in which the late Justice articulated his view that a "sentence of 111 years in prison is impossible for a human being to serve, and therefore violates both the cruel and unusual punishments clause of the Eighth Amendment to the United States Constitution and the cruel or unusual punishment clause of article I, section 17 of the California Constitution." (*Id.* at pp. 600-601 (conc. opn. of Mosk, J.).) Echoing Justice Mosk's concurrence, defendant asserts "[a] sentence that no human being could conceivably complete serves no rational legislative purpose, under either a retributive or a utilitarian theory of punishment." While this may provide for a rousing discussion in a legal philosophy course, it does not persuade us that the 80-years-to-life sentence defendant received for his crimes constitutes cruel and unusual punishment.

Justice Mosk's concurring opinion in *Deloza* was not the view of the majority of our Supreme Court and therefore "has no precedential value." (*People v. Byrd* (2001) 89 Cal.App.4th 1373, 1383.) Moreover, his cruel and unusual punishment analysis has been respectfully criticized. Countering Justice Mosk's opinion, the Court of Appeal in *Byrd* explained a sentence that a defendant cannot serve in his lifetime "serves valid penological purposes: it unmistakably reflects society's condemnation of defendant's conduct and it provides a strong psychological deterrent to those who would consider engaging in that sort of conduct in the future." (*Ibid.*)

In *Byrd*, the Court of Appeal rejected the defendant's claim that his sentence of 115 years plus 444 years to life constituted cruel and unusual punishment. (*People v. Byrd, supra*, 89 Cal.App.4th at p. 1382.) The court concluded it was "immaterial" the defendant could not complete his sentence in his lifetime or even several lifetimes, explaining: "In practical effect, he is in no different position than a defendant who has received a sentence of life without possibility of parole: he will be in prison all his life. However, imposition of a sentence of life without possibility of parole in an appropriate case does not constitute cruel or unusual punishment under either our state Constitution [citation] or the federal Constitution." (*Id.* at p. 1383.) We agree with *Byrd* that the fact a defendant's sentence exceeds his life expectancy does not compel a conclusion that the sentence constitutes cruel and unusual punishment. (See *Harmelin*, *supra*, 501 U.S. at pp. 961, 994-996 (lead opn. of Scalia, J.) [sentence of life in prison without parole for possessing 672 grams of cocaine was not cruel or unusual under the Eighth Amendment]; *id.* at p. 1001 (conc. opn. of Kennedy, J.).)

Nor has defendant persuaded us that his sentence of 80 years to life is grossly disproportionate to his crimes. Defendant was convicted of 10 grave offenses involving the sexual abuse of two girls under the age of 10; one child was only five years old at the time the abuse was discovered. The girls described frequent molestations that included oral copulation and digital penetration, occurring over a considerable span of

31

time. "Any one act in isolation was a serious offense. Cumulatively, without a doubt, his offenses were grave." (*Christensen, supra*, 229 Cal.App.4th at p. 806.) Defendant's repeated sexual assaults had lasting impacts on the victims. At defendant's sentencing hearing, which occurred four years after his arrest, both girls provided statements expressing continued fear of him and reoccurring nightmares.

Our court and others have rejected cruel and unusual punishment arguments and upheld lengthy prison terms in cases involving a defendant's commission of multiple sex crimes. In *Christensen, supra*, 229 Cal.App.4th 781, we upheld a defendant's sentence of 27 years to life for five counts of lewd conduct upon three boys under the age of 14. (*Id.* at pp. 803-806.) In *People v. Retanan* (2007) 154 Cal.App.4th 1219, the Court of Appeal concluded the defendant's sentence of 135 years to life was not disproportionate to his offenses where he was convicted of 16 sex offenses involving four young girls. (*Id.* at pp. 1222, 1230-1231; see *People v. Bestelmeyer* (1985) 166 Cal.App.3d 520, 522, 531-532 [concluding sentence of 129 years for 25 sex offenses was not cruel or unusual punishment].)

*Defendant's Sentence Does Not Constitute Cruel or Unusual Punishment Under the California Constitution*

In the trial court and in his opening brief, defendant argued only that his sentence constitutes cruel and unusual punishment in violation of the Eighth Amendment to the federal Constitution. And we have now rejected this claim. Defendant did not claim that his sentence constituted "[c]ruel *or* unusual punishment" in violation of the California Constitution. (Cal. Const., art. I, § 17, italics added.) In fact, in his opening brief, he did not even mention the California Constitution or the protection it provides.

The Attorney General thus argues defendant has preserved and presented only a federal constitutional claim. In his reply brief, defendant makes an attempt to convince us otherwise. He asserts "[w]hether the federal and state constitutions prescribe

32

substantively different standards regarding cruel and unusual punishment is not clear." Regardless, that does not excuse defendant's failure to clearly identify the constitutional basis of his claim—both federal and state. Nevertheless, "in the interest of judicial economy to prevent the inevitable ineffectiveness-of-counsel claim," we briefly analyze defendant's sentence under the California Constitution to determine whether it constitutes cruel or unusual punishment. (*People v. Norman* (2003) 109 Cal.App.4th 221, 230.)

Our state constitution bars punishment "so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424.) We assess proportionality by considering: (1) the nature of the offense and the offender (*id*. at p. 425); (2) a comparison of the sentence with sentences for more serious offenses in the same jurisdiction—an intrajurisdictional comparison (*id*. at p. 426); and (3) a comparison of the sentence with sentences for the same offense in other jurisdictions—an interjurisdictional comparison (*id*. at p. 427).

We have already discussed the grave nature of defendant's multiple sexual offenses involving two young girls under the age of 10. Nothing about the nature of defendant's crimes persuades us his sentence is unconstitutionally cruel or unusual.

Defendant does not fare much better when we examine the nature of the offender. "'A look at the nature of the offender includes an inquiry into whether "the punishment is grossly disproportionate to the defendant's individual culpability as shown by such factors as his age, prior criminality, personal characteristics, and state of mind."''" (*People v. Reyes* (2016) 246 Cal.App.4th 62, 87.) None of these factors suggest defendant's punishment is grossly disproportional to his individual culpability. Defendant was an adult who understood his actions were criminal. While defendant did not have any prior sex convictions, he had numerous prior drug convictions and had served time in prison for burglary. That defendant has had a positive impact on the lives of others through his drug counseling and ministry does not negate the devastating effect

33

his crimes had on the lives of his two step-granddaughters. As their step-grandfather, defendant should have protected the girls from harm rather than causing them lasting anguish and fear.

The final two factors bolster our conclusion. Defendant does not present a compelling intrajurisdictional comparison. Repeating his argument from the trial court, defendant asserts he "would have received a lesser sentence if he had committed a homicide." This is an inapt comparison. "'The penalties for single offenses . . . cannot properly be compared to those for multiple offenses . . . .'" (*Christensen, supra*, 229 Cal.App.4th at p. 808.) Defendant was convicted of 10 sex offenses involving two young girls, not a single offense involving one victim. Finally, defendant undertakes no interjurisdictional comparison. We deem this omission "as a concession that his sentence withstands a constitutional challenge on [this] basis." (*People v. Retanan, supra*, 154 Cal.App.4th at p. 1231.)

In conclusion, defendant has not demonstrated his sentence is cruel and/or unusual punishment.

IMPOSITION OF FINES AND FEES

Defendant contends his federal and state constitutional rights to due process were violated because the court imposed certain fines and fees at sentencing without determining his ability to pay them. Relying on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), defendant asserts he is indigent and requests we remand the matter for the court to conduct a hearing on his ability to pay these fines and fees. We conclude a remand is unnecessary.

34

At defendant's sentencing hearing, the court imposed a $300 state restitution fine, the statutory minimum (§ 1202.4, subd. (b)(1)), and a $300 sex offender fine (§ 290.3, subd. (a)).[3] The court also ordered defendant to pay "70 dollars per count for court fees," which were described in the sentencing minute order as a $40 court operations fee (§ 1465.8, subd. (a)(1)) and a $30 criminal conviction fee (Gov. Code, § 70373, subd. (a)(1)) (hereinafter court fees). At the time, statutory language and case law required the court to impose the minimum restitution fine and court fees without regard to defendant's ability to pay. (§ 1202.4, subd. (c); *People v. Robinson* (2012) 209 Cal.App.4th 401, 405 [holding the assessments under § 1465.8 and Gov. Code, § 70373 are a mandatory part of a defendant's sentence].) Below, defendant did not object or assert he lacked the ability to satisfy these amounts. Nor did defendant object to the $300 sex offender fine or argue he was unable to pay it, even though the court could consider his ability to pay when determining whether to impose this fine. (§ 290.3, subd. (a).)

*Dueñas, supra*, 30 Cal.App.5th 1157, was decided after defendant's sentencing hearing, based on readily distinguishable facts. In *Dueñas*, the defendant was an unemployed homeless mother with a neuromuscular disorder, whose driver's license had been suspended because she had been unable to pay the fees on prior juvenile citations. (*Id.* at pp. 1160-1161.) She pleaded no contest to driving with a suspended license and was placed on probation with terms that she pay a $150 restitution fine, a $40 court operations fee, and a $30 court facilities fee. (*Id.* at pp. 1161-1162.)

At her request, the court conducted a hearing on her ability to pay attorney fees. (*Dueñas, supra*, 30 Cal.App.5th at p. 1162.) Finding her indigent, the court waived the attorney fees but concluded the court fees were mandatory regardless of her inability

---

[3]     A $300 parole revocation fine was also imposed and stayed as required by section 1202.45. Defendant does not argue his due process rights were violated by the court imposing and staying this fine in the absence of an ability to pay hearing. Accordingly, we do not include it in our analysis.

35

to pay them and that she had not made the necessary showing to waive the restitution fine. (*Id.* at p. 1163.) The court indicated any sums remaining at the end of her probation would be sent to collections. (*Ibid.*) Thus, the new restitution fine and court fees pushed her further down in debt, decreasing her ability to successfully complete the terms of her probation or obtain a valid license and increasing the odds she would again be convicted of driving with a suspended license and incur more jail time and financial penalties.

On appeal, Dueñas contended she was being punished for being poor and that the imposition of the restitution fine and court fees without considering her ability to pay them violated her state and federal constitutional rights to due process. (*Dueñas, supra*, 30 Cal.App.5th at p. 1160.) The Court of Appeal agreed, concluding due process principles require a court determine a defendant's ability to pay before imposing court fees under section 1465.8 and Government Code section 70373. (*Dueñas*, at pp. 1164, 1168.) Although the trial court was statutorily required to impose the minimum restitution fine, the Court of Appeal concluded execution of the fine should be stayed until the trial court determined Dueñas's ability to pay it. (*Id.* at p. 1164.)

*Dueñas* spawned a legion of Court of Appeal decisions and several splits of authority concerning "if, and under what circumstances, the forfeiture doctrine applies to a claim brought pursuant to the decision in *Dueñas*" (*People v. Montes* (2021) 59 Cal.App.5th 1107, 1115) and "if and under what circumstances the constitutional concerns underpinning the decision in *Dueñas* apply" (*id.* at p 1116 [collecting cases]).[4] With one exception, we move beyond the issues of whether defendant forfeited his appellate argument by failing to object and request an ability to pay hearing below and whether defendant's claim concerning the restitution fine should be analyzed under the

---

[4]    The issues of whether a court must consider a defendant's ability to pay before imposing fees, fines, and assessments and who has the burden of proof regarding a defendant's inability to pay are currently pending before the California Supreme Court in *People v. Kopp* (2019) 38 Cal.App.5th 47, review granted November 13, 2019, S257844.

Eighth Amendment to the United States Constitution as the Attorney General argues or under "due process principles" as defendant asserts, and we conclude any error was harmless.

The exception concerns defendant's claim that he is entitled to a remand for the court to consider his ability to pay the $300 sex offender fine. Defendant forfeited this contention by failing below "to affirmatively argue against application of [this] fine and demonstrate why it should not be imposed." (*People v. McMahan* (1992) 3 Cal.App.4th 740, 750.) Under section 290.3, subdivision (a), the court had the authority to waive this fine if it determined defendant did not have the ability to pay it. But the burden was squarely on defendant to object to the fine based on his inability to pay. (*McMahan*, at p. 750.) Nothing in *Dueñas* absolved nor shifted this burden. Defendant's failure to object to the $300 sex offender fine forfeited this claim.

We now turn to defendant's challenges to the restitution fine and court fees. Assuming, without deciding, defendant did not forfeit his appellate claims and that the court violated his right to due process by imposing the restitution fine and court fees without conducting an ability to pay hearing, we conclude any error was harmless beyond a reasonable doubt. (*People v. Aviles* (2019) 39 Cal.App.5th 1055, 1075 (*Aviles*) citing *Chapman v. California* (1967) 386 U.S. 18, 24, *People v. Johnson* (2019) 35 Cal.App.5th 134, 139-140, & *People v. Jones* (2019) 36 Cal.App.5th 1028, 1030-1031.)

In *Aviles*, the Court of Appeal found harmless beyond a reasonable doubt the trial court's failure to conduct a hearing on the defendant's ability to pay prior to imposing court fees and a substantial restitution fine. (*Aviles, supra*, 39 Cal.App.5th at p. 1075.) There, the defendant was sentenced to state prison in two cases for a term of 82 years to life and ordered to pay restitution fines totaling $10,600, as well as $280 in court fees. (*Id.* at pp. 1061-1062.) The defendant in *Aviles*, like defendant here, relied on *Dueñas* in arguing that the imposition of these fines and court fees without determining his ability to pay violated his constitutional right to due process. (*Aviles*, at pp. 1059-

37

1060.)  In finding any error harmless, the *Aviles* court noted: "'"Ability to pay does not necessarily require existing employment or cash on hand." [Citation.]  "[I]n determining whether a defendant has the ability to pay a restitution fine, the court is not limited to considering a defendant's *present* ability but may consider a defendant's ability to pay in the future." [Citation.]  This include[s] the defendant's ability to obtain prison wages and to earn money after his release from custody."'"  (*Id.* at p. 1076.)  As there was no evidence in the record that the defendant suffered from any permanent physical or mental disabilities that would prevent him from earning a wage in prison, the court inferred the defendant had the ability to pay the fine and fees from his future prison wages.  (*Id.* at pp. 1076-1077.)

Here, the record similarly shows defendant has the potential to earn a wage in prison and pay the imposed restitution fine and court fees.  Defendant was 55 years old when he was sentenced to prison for 80 years to life.  There is no evidence he suffered from permanent physical or mental disabilities that might prevent him from working and obtaining a wage in prison.  Prior to his incarceration, he ran a men's recovery home, providing drug counseling and spiritual guidance to the participants.  Even earning the lowest prison wage of $12 a month (Cal. Code Regs., tit. 15, § 3041.2, subd. (a)(1)) and having 50 percent of his wages garnished to pay the restitution fine (§ 2085.5, subds. (a)), defendant would be able to pay the $300 restitution fine in less than 5 years.  With similar monthly payments, he could satisfy the $700 in court fees in less than 10 years.

Should defendant receive any money from family or friends, a portion of it would go toward the payment of the restitution fine and court fees.  (*People v. Potts* (2019) 6 Cal.5th 1012, 1055-1056 (*Potts*) [court's error in basing restitution fine on the mistaken belief that capital defendant could work while incarcerated was harmless as portion of the money the defendant received from family or friends could be withheld to pay the fine].)  As the court explained in *Aviles*:  "While it may take defendant some time to pay the amounts imposed in this case, that circumstance does not support his inability

38

to make payments on these amounts from either prison wages or monetary gifts from family and friends during his lengthy prison sentence." (*Aviles, supra*, 39 Cal.App.5th at p. 1077.)

Our colleagues in the Fifth Appellate District recently took a different approach in *Montes, supra*, 59 Cal.App.5th 1107. There, pre-*Dueñas*, the defendant was sentenced to state prison (*id.* at p. 1110) and ordered to pay a $300 restitution fine, $520 in court operations fees, and $390 in court facilities fees. (*Montes*, at p. 1114.) Although the defendant had not argued below that he lacked the ability to pay these amounts, the *Montes* court concluded he had not forfeited his *Dueñas* contention and determined a limited remand was appropriate to permit the parties to address the issue of the defendant's ability to pay in the first instance in the trial court. (*Montes*, at p. 1121.) The Court of Appeal rejected the Attorney General's harmless error argument, finding the record "undeveloped" and that reliance on the defendant's ability to pay the amounts from prison wages or gifts from family or friends was "purely speculative." (*Id.* at p. 1123.)

In *Montes*, Justice Poochigian dissented from the court's decision to remand the matter to allow defendant to challenge the restitution fine and court fees in the trial court. (*Montes, supra*, 59 Cal.App.5th at p. 1124 (conc. & dis. opn. of Poochigian, J.).) Relying on *Aviles* and *Potts*, Justice Poochigan concluded "any error arising from the court's failure to make an ability to pay finding was harmless beyond a reasonable doubt" (*id.* at p. 1125 (conc. & dis. opn. of Poochigan, J.)) because it could be inferred from the record that the defendant has the ability to pay the amounts from either prison wages or monetary gifts from friends and family (*id.* at pp. 1125-1126 (conc. & dis. opn. of Poochigan, J.)).

We reach the same conclusion here.  We are confident beyond a reasonable doubt that the court would have imposed the restitution fine and court fees even after considering defendant's ability to pay.


DISPOSITION


The judgment is affirmed.



IKOLA, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


MOORE, J.